## DAVID S. FOWLER, SHERIFF, vs. CHARLES BISHOP.

Officers' receipts, though usually absolute and unconditional in terms, and conclusive in respect to their recitals and admissions, are nevertheless by operation of law contingent.

The right of the officer to enforce the promises of the receipt rests on his liability to the creditor, during the existence of the lien, and to the debtor as owner when the lien is dissolved; and the receiptor can successfully defend, whenever he can show by proper evidence that the liability of the officer to both has ceased.

The contract of suretyship contained in an officer's receipt is favored in law and is an essential and mitigating incident of our system of attachment on mesne process.

The goods of *T & M* were attached in a suit brought against them by *B*, and the defendant gave a receipt therefor under seal to the officer. *T & M* became insolvent debtors, and a trustee was appointed, who caused a suit to be brought upon the receipt in the name of the officer for the benefit of the estate, under the provisions of the act of 1860. That act provides that where personal property is attached and receipted and the defendant within sixty days goes into insolvency, the property so attached or its full value shall be delivered by the receiptor to the trustee in insolvency, who may bring suit therefor upon the receipt in the name of the officer. The officer did not remove the property at the time of the attachment, and it never came into the actual possession of the defendant, but was sold by *T & M* before the appointment of the trustee. They however put into his hands $100 of the proceeds of the sale, which was less than the full value of the property. Held, 1. That by the insolvent act of 1853 the attachment lien was dissolved, and but for the act of 1860 the receipt would have been discharged. 2. That the purpose of the act of 1860 was to provide for the delivery to the trustee of the property actually taken and that only, or its actual value, and not to transfer to him any rights of the attaching creditor; and that therefore the defendant was not liable except so far as property or its value came into his hands. · 3. That the·plaintiff was entitled to recover the $100 actually received by the defendant from the proceeds of the sale of the property. [Dutton and McCurdy, Js., dissenting, and holding that the plaintiff was entitled to recover the full value of the property receipted.]

ACTION of covenant on a sealed receipt, executed to the plaintiff as sheriff by the defendant, jointly and severally with Elisha Tilden and William McNeil, in which they acknowledged the receipt of certain property then attached by the plaintiff as an officer, and covenanted to deliver the same to him on demand or pay $500, or if demand was not made before judgment recovered, to pay the amount recovered with costs if less than $500, with a provision that the defendants should be estopped from denying that the property described

had been attached by the sheriff and that they had received the same from him.

The case was tried in the superior court on the general issue with notice closed to the court, and the following facts were found by the court:

The property was attached by the plaintiff as sheriff, in a suit in favor of one Brand, against Tilden and McNeil as partners, on the 25th of May, 1861. The action was trespass, and the writ directed the attachment of property to the amount of $500. The plaintiff took the property into his possession, but without removing it, and retained the possession until the defendant with Tilden & McNeil executed the receipt, when he delivered it to Tilden & McNeil. The defendant never had the actual possession of the property. It was soon after sold by Tilden & McNeil, who appropriated the avails thereof to their own use. The action is now pending in the superior court. On the 29th of June, 1861, the court of probate for the district of New Haven, upon an application brought by creditors of Tilden & McNeil, passed a decree declaring them insolvent debtors, and appointed a trustee on their estate. The plaintiff, at the request of the trustee, made demand of the defendant for the property specified in the receipt, but the defendant refused to deliver it to him, and also refused to pay its value. Thereupon the trustee caused the present suit to be brought in the name of the sheriff, and is now prosecuting the same for the benefit of the estate. The act of 1860, under which the trustee claimed the property and the right to bring the suit, is set forth in the opinion of the court. It provides in substance that whenever property shall be attached and receipted and the defendant shall go into insolvency within sixty days thereafter, (the lien being dissolved thereby under the general provisions of the insolvent act of 1853,) the property or its full value shall be delivered by the receiptor to the trustee in insolvency, who shall have a right to bring a suit therefor on the receipt in the name of the officer. The property was sold by Tilden & McNeil before the appointment of the trustee. At the time of the sale $100 of the purchase money was put by them into the hands of the defendant, to

indemnify him for any loss or expense he might incur in consequence of signing the receipt. This fact was disclosed to the court of probate by Tilden, upon an investigation before that court under the 14th section of the insolvent act, and the court upon that hearing found that there was a further sum of $100 in Tilden's hands unaccounted for, and ordered him to pay it to the trustee, and to stand committed until the order was complied with. Failing to comply with the order, he was committed to the New Haven County jail, where he remained until the defendant procured his discharge, by paying to the trustee the $100 required. The actual value of the property at the time it was attached was $175. The evidence offered by the defendant to prove that the action against Tilden & McNeil was an action of tort; also to prove that the trustee was prosecuting the suit in the name of the sheriff; also to prove the proceedings before the court of probate in the matter of the examination of Tilden, and the payment of $100 by the defendant to procure his release; and also to prove the value of the property, was objected to by the plaintiff as irrelevant, and as contradicting the receipt, by which the plaintiff claimed that the defendant was estopped; but the court overruled the objection and admitted the evidence.

On these facts the case was reserved for the advice of this court.

*Doolittle* and *Bronson,* for the plaintiff.

*L. G. Peck* and *Shelton,* for the defendant.

BUTLER, J. Officers' receipts are usually absolute and unconditional in terms, and conclusive in respect to their recitals and admissions, but are, nevertheless, by operation of law contingent. The officer has no personal interest in the property or in the possession of it; he holds it as an officer of the law, and as bailee for purposes of law. His right to resume the possession of it, and enforce the promises of the receipt, rests on his liability to the creditor during the existence of the lien, and to the debtor or owner when that lien is dissolved. And when his liability to the creditor ceases by reason of a

dissolution of the lien, and he is not liable over to the debtor or owner because no property was in fact attached, or because, if attached, it was not removed, or, if attached and removed, was immediately restored to the debtor or owner, the receipt becomes *functus officio* and inoperative; and it is open to the receiptor at all times to show, by any proper evidence, that the instrument has thus become inoperative. So far, therefore, as the evidence offered and received tended to show that fact, it was clearly admissible; and we think it also admissible and applicable to the issues as modified by the act of 1860.

In this case the debtors were owners of the property when it was attached; it was not removed from their possession or delivered in fact to the receiptor; by the law of 1853 and the fact of insolvency the lien was dissolved; and but for the act of 1860 the receipt would have been inoperative. In what way, and to what extent, then, did that act make or continue this receipt operative against the receiptor, and in favor of the trustee in insolvency?

The plaintiff does not claim, and obviously could not with propriety claim, that the statute provides for a transfer of any rights, as such, acquired by the attaching creditor. In this case the original action was tort for unliquidated damages. It does not appear that the plaintiff would recover any thing, or if any thing, how much. No provision is made, by a prosecution of the suit or otherwise, for ascertaining the amount of those damages and the extent to which the receiptor would be liable on his receipt, under the alternative promise to pay the damages and cost recovered by judgment; and every line of the statute indicates a purpose to provide for the delivery of the property to the trustee because he is entitled to it by virtue of the assignment, and not because any rights of the attaching creditor are intended to be transferred to him.

But the plaintiff does insist that the contract must be presumed to have been made in view of the operation of the statute; that the lien acquired in favor of the attaching creditor is expressly continued, in all cases, until the property or its value has been delivered or paid to the trustee; that by the common law and the terms of the receipt the officer is entitled

to recover the property, or its value, from the receptor, by force of the estoppels of the instrument, at all times and in all cases while the lien is in force; and that the statute gives to the trustee all the rights of the officer under or by virtue of the receipt; and that therefore, although no property was in fact taken by the officer or receptor, the intention of the legislature that the receptor should pay the sum stipulated in the receipt to the trustee is clear.

The plaintiff is right in respect to the first clause of this claim. Contracts are usually made with reference to the established law of the land, and should be so understood and construed, unless otherwise clearly indicated by the terms of the agreement. He is also correct in respect to the right of the officer to sue the receipt. The officer may bring his action and recover the agreed value of the property at any time while the lien is in force. But if no property was in fact attached, or none was removed and came into the possession of the receptor, the officer can not retain that value after the lien is dissolved, or pay it over to the debtor or his trustee. The receptor in such cases is a *surety;* and, if his money is taken by the officer and by force of an action on the receipt, it remains his money until appropriated to pay the debt of the creditor, and in case of a dissolution of the lien, or if there is a surplus after satisfying the judgment recovered, the officer is a bailee for and answerable to the receptor for the amount. Hence, although the right to sue on the receipt in such cases is unquestionable, the exercise of that right is not expected by the receptor or the officer until judgment and execution have been obtained; and the exercise of it can not affect the ultimate rights of either.

The import of the remaining portion of the plaintiff's claim is, that *in all cases* where the property, or its value as described in the receipt, has not actually passed into the hands of the trustee, whether that was possible because the receptor held the property, or whether it was impossible because no such property was actually attached, or because, not having been removed, the debtor has disposed of it and paid his debts, or sold it and bought other property, or paid it to a creditor and

released other property from pledge which has come to the hands of the trustee, or otherwise made a disposition of it in his business with or without a view to insolvency, the receiptor is made liable by the statute to the trustee in insolvency, in an action on the receipt, for the value of the property as admitted in the receipt, to swell the estate of the insolvent in his hands; that in and by every receipt executed to an officer since the passage of the act of 1860, the receiptor, whether property was actually attached or removed or not, has bound himself, not only to pay the judgment and cost if any are recovered, but, in case of a dissolution of the lien by insolvency, to pay the value of the property as admitted in the receipt to the trustee in insolvency; or, in other words, that the receiptor guarantees that the trustee in insolvency, in case of a dissolution of the lien, shall receive the property or a sum equal to the admitted value of the property described in the receipt, though none was attached and it is not certain that any judgment will be obtained.   If such be the character of the act, it turns a *suretyship* on behalf of one person, for a *contingent* unascertained debt, or unascertained *possible* damages, into an *absolute liability* to another person for a *greater amount*, (for attachments are ordinarily made and receipts executed, especially in actions of tort, for a much larger sum than it is expected will be required to satisfy the judgment,) and the law is grossly inequitable and unjust.   Such an act would clearly be a violation of the fundamental principles of the social compact, and invalid if intended to embrace receipts executed before its passage.

It is an established rule in the interpretation of statutes that "a construction which is contrary to natural justice and equity, or which will be necessarily productive of practical inconvenience to the community, is to be rejected, unless the language of the lawgiver is so plain as not to admit of a different construction, (*Donaldson* v. *Wood*, 22 Wend., 397;) and it is unquestionable that the construction claimed by the plaintiff would be contrary to natural justice and equity, and productive of inconvenience to the community.

The contract of suretyship contained in an officer's receipt

is favored in law. It is an essential and mitigating incident of our system of attachment on mesne process. "The ratification of such agreements," says Judge Sherman, in *Jones* v. *Gilbert*, 13 Conn., 521, "according to their just intent, is important to both debtor and creditor. The debtor by procuring some friend to give a written acknowledgment of the receipt of property, which has not been attached at all, estimated at a sufficient sum, with an engagement to redeliver it on demand, shields his goods from seizure, secures the debt, and protects the officer. When the debtor is willing to secure whatever judgment may be ultimately rendered, but is desirous in the mean time of disposing of property actually attached, the object of each party may be attained by an estimate, acceptable to the creditor or officer. These agreements are voluntary and lawful. To nullify them would divest the parties of the important liberty of making arrangements for their mutual benefit, at a crisis deeply interesting to both." Recognizing the importance of this *liberty*, the legislature have further provided for the dissolution of the attachment by the substitution of a bond. And these two methods of releasing property from attachment, or preventing it from being attached, are essential to. prevent our system of attachment from becoming an intolerable oppression. But if by the act in question the legislature have done what the plaintiff claims they have, (and what they unquestionably have if his construction is right,) then they have superadded an obligation to an officer's receipt, not contemplated by the contract or germane to its purpose, and which will effectually prevent such contracts from being hereafter made. They have done that which, in the language of Judge Sherman, will "divest the parties of the important liberty of making arrangements for their mutual benefit at a crisis deeply interesting to both." Unless therefore we are imperatively bound by the explicit language of the act, and because it is not susceptible of any other construction, we can not hold that such was the intention of the General Assembly consistently with the just rules of interpretation to which we have referred.

But a careful examination and analysis of the statute dis-

closes no such intention. The first seventeen lines provide that whenever any property shall be attached and receipted for or a bond substituted, and before the lien becomes preferred the debtor shall go or be driven into insolvency, "all *said property* so attached or levied upon shall in all cases be *delivered* to the trustee or trustees in insolvency." These lines express in general terms the simple object and purpose of the law, and all the object and purpose which appears upon its face; and it is a legal and just purpose. The next five lines, obviously in aid of that purpose, provide that the attachments and levies shall not be dissolved, in any case, until *the property* attached or levied on, or its value, has been *delivered* to the trustees, and the purpose effected. The next ten lines make it the duty of the trustees to cause *such property* to be *delivered* to them, and to demand it of the officer with the receipt. Thus far there is no intent disclosed, except to provide that *property* attached and levied upon, or its value, shall be *demanded* by the trustees, and that, or the value, shall be *delivered* to them. It is not expressly said or necessarily implied that property which was not in fact attached, or in respect to which the attachment was not perfected by an exclusive possession, and which was returned by the officer into the possession of the debtor, shall be demanded of the officer or receiptor. On the contrary, the terms *attached* and *levied upon* imply a possession by the officer or receiptor, and the language "*then in the hands* of the officer or which has been receipted for," plainly imports that the property, or the actual value of it, which the trustee is to demand of the officer with the receipt, and in respect to which the lien is to continue to enable the trustees to recover it, is such property and such only as has been taken from the possession of the debtor, and is in the hands of the officer or receiptor, or has been disposed of by them. The remaining four lines give the trustee the right to recover the value of "*such* property" from any person receipting the same, in the same manner as the officer might do in his own right. This provision is also in aid of the general purpose which appears in every part of the act, and the right conferred upon the trustee is limited to the right possessed by the officer, to

what he might do in his own right while the lien is in force in respect to "*such property*," that is, in respect to property actually attached and taken from the possession of the debtor. For we have seen that when the officer exercises "his own right" to sue for the value of property, described in a receipt but never in fact attached, he holds the money as bailee of the receiptor till appropriated to satisfy a judgment; and the statute gives the trustee no greater right.

It has been urged in the argument that it was the intention of those who framed the act and of the legislature to prevent by its enactment the fraudulent disposition of property attached or receipted, by a debtor who purposes insolvency before the lien becomes preferred. Frauds of that kind doubtless may be and have been perpetrated, and their prevention is desirable. But it is not necessary or just to require receiptors in all cases to guarantee that they shall not be attempted, under a penalty exceeding the value of the property; and nothing but the most unequivocal language would justify us in finding such to have been the intention, either of those who framed the law or of the legislature; and certainly no such intention clearly appears in the act.

Again, the law in terms and in its general purpose includes property which has been released from attachment by the substitution of a bond, but no provision is made for enforcing the delivery of the property by action on the bond, nor is any right whatever in the bond given to the trustees. Doubtless this discrimination rests on the fact that the lien is discharged by the substitution of the bond, and the property presumptively restored to the debtor. But the undertakings of the obligor in the bond, and of the receiptor in the receipt where property was not in fact attached or was not removed, are precisely the same; both have become *mere sureties* for the officer to the creditor; and the relation of the debtor to the property, and his opportunity to make a fraudulent disposition of it, are the same. The property in one case is just as much exposed to the mischief which it is suggested that it was the purpose of the law to prevent as in the other. Yet the legislature, although they embrace the property described in both within the

declared *purpose* of the act, impose no similar additional obligation on the obligor in the bond.   No satisfactory reason has been assigned, and we think none can be assigned, why one should be charged and the other exempt; and this discrimination is inexplicable, except upon the hypothesis that it was the *delivery* of the *property* actually *taken* and *held* by the officer and receiptor, and that only, or its actual value if disposed of by them, for which they intended to provide.

But it is very clear upon that hypothesis that the trustee in insolvency is entitled to avail himself of the receipt in all cases where the property or its avails has come to the possession of the receiptor, to recover the actual value of the property or such avails.   In this case it is found that the actual value of the property was $175, and that it was sold by the debtor, and $100 of the avails deposited with the defendant. That sum the plaintiff is entitled to recover.   It can not avail the defendant to claim that he paid it to the trustee to release the debtor from imprisonment.   The court of probate found that a *further sum* of $100 was in the hands of and retained by the debtor, and the fair import of the finding of the superior court is, that the sums were different, and not identical.

The superior court must therefore be advised to render judgment for the plaintiff for the sum of $100, and interest from the time of the sale of the property and deposit of the money.

In this opinion HINMAN, C. J., and SANFORD, J., concurred.

DUTTON, J.   I can not concur in the decision of the court. The plaintiff in this case as an officer had, since 1860, attached certain property in a suit in favor of Brand against Tilden & McNeil.   The defendant receipted the property by an instrument under seal, and bound himself to deliver it to the plaintiff, or to pay him five hundred dollars.   This engagement was unconditional in its terms.   There can not be a shadow of doubt that during the life of the attachment the plaintiff could, at any time, demand the property of the defendant, and on his refusing or neglecting to deliver it, he could recover the five hundred dollars.   What has occurred to take away

this right of action, which is undoubted, so far as the instrument is concerned, to the extent at least of the value of the property? Tilden & McNeil, it is true, within sixty days went into insolvency. This dissolved the attachment, and would probably have taken away the right of the plaintiff to recover the money of the receiptor, were it not for the statute of 1860. But that law by its very terms continued the attachment in force until the property attached or its value should have been delivered up to the trustee. The language of that statute is, " Whenever before said attachment lien or the lien created by the levy of any writ of execution shall become a preferred and permanent lien on said property so attached or levied upon, the defendant or defendants in any such writ of attachment shall go into insolvency, all of said property so attached or levied upon shall in all cases be delivered to the trustee or trustees in insolvency, and said attachments or levies shall *in no case* be dissolved until said property so attached or levied on, or the value of the same, shall have been delivered to the trustee or trustees of said insolvent defendant or defendants." Language could not be more explicit. In this case neither the property attached nor its value has been delivered to the trustee. The attachment lien therefore has not been dissolved. Yet it seems that although the attachment is in full force, the officer can not recover on an unconditional receipt under seal.

Where a statute is so explicit no real or imaginary hardship to the receiptor ought to affect the construction of it. If the legislature has made a hard law it is not the duty of the court to nullify it. But there is no hardship in the case. Whatever the defendant did, he did understandingly, and of his own free will. If he signed a fictitious receipt he can not complain if it is treated as genuine. If he took the property and gave it up to the debtor, he did it voluntarily to accommodate him. He knew the law as every body is bound to, and as a prudent man he did not sign such an instrument without ascertaining what his liability would be, and that under the law of 1860 such a receipt, if the debtor went into insolvency in sixty days, would enure to the benefit of the general creditors, as in some states all receipts do. Of what then has he

to complain? He is required to do merely what he voluntarily undertook to do. The law does not regard the enforcement of an obligation as either hard or unjust.

What is there in this case to call for any special pity for the defendant or indulgence towards him? It is said that where a receiptor does not take the property into his custody, or does so and afterwards delivers it up, he becomes a surety. What then? Most indorsers are sureties; are they therefore not to be held responsible? Probably many of the creditors of these debtors became so by reason of having been bondsmen for them at their request, or by reason of having been obliged to pay money for them. All of them have parted with money or property for their benefit. They all had reason to expect indemnity. But the defendant, if he became surety, became so after the debtors had become embarrassed, and by voluntarily relinquishing the means of securing himself which he had once had or might have had. Why then should he be relieved at the expense of the creditors? What ground of sympathy for an unfortunate sufferer is there here, to require a court to construe away the plain provisions of a statute?

The construction given to this statute appears to me to contravene the only object which the legislature had in view in passing it. It is well known as a matter of history, and it is obvious from the statute itself, that the necessity for its passage was the fact that many insolvent debtors had done, what it is plain they might do when their property was attached, and perhaps attached upon their own procurement; they had provided a friend to receipt the property, and redeliver it or leave it in their hands, and then converted it into money, and either pocketed it or paid it to some favorite creditor out of the state. This could be done with impunity, and it seems legally, since their assignment in insolvency dissolved the attachment and left the receiptor discharged of his liability. *Mead* v. *Dayton,* 28 Conn., 33. By the assignment not only the attaching creditor but all the general creditors lost all benefit from the property attached. In this way the statute of 1853, instead of preventing a preference among creditors, enabled the debtor to prefer favorite creditors more effectually than before the

statute was passed. The legislature of 1860 intended to prevent such a palpable and unjust evasion of an equitable law. But the construction given to it by a majority of the court defeats this object. The statute is of no conceivable use. The effect of the two statutes on this construction is to tie the hands of creditors, and leave the debtor to do as he pleases with his property. It renders it unsafe for any particular creditor to attach, as it will be only a warning to the debtor to put his property beyond the reach of his creditors. The attaching creditor will generally not only lose his debt, but also the expense of trying to secure it. The consequence will inevitably be that the law of 1853 will become worse than useless, or the legislature will be compelled to re-enact the provisions of the law of 1860 in terms, if possible, more explicit.

In this opinion McCURDY, J., concurred.