# Boulo *v.* New Orleans, Mobile & Texas Railroad Company.

*Bill in Equity for Injunction against Railroad Company.*

1. *Injunction of trespass to real estate.*—The jurisdiction of a court of equity to enjoin trespasses to real estate, though of recent origin, is now firmly established ; but the court will never exercise this power, unless the party complaining shows a clear title, legal or equitable, and an injury not capable of prevention otherwise.

2. *Title to Fort Charlotte lots in Mobile.*—The lots occupying the site of old Fort Charlotte in Mobile, surveyed and sold under the authority of an act of congress approved on 20th April, 1818, as shown by the map and plat returned to the general land-office by the surveyor-general, though fronting on the Mobile river, did not extend to the river, but were separated from it by a narrow strip of land ; and neither this strip of land, nor the adjacent land in front, since reclaimed from the water, passed to a grantee by a patent from the United States for the lots.

3. *Lease of lots by corporate authorities of Mobile, under statutory authority, to defray expenses of filling up and draining.*—The corporate authorities of the city of Mobile having been authorized, by an amendment of the city charter adopted in 1831 (Sess. Acts 1830-31, p. 54), " to require lots to be cleansed and cleared of all such nuisances as may seem necessary to be removed," and, where the owner of any lot could not be found, to cause such cleansing to be done, and to lease the lot for such term as would cover the expense of cleansing ; a lease, executed by said corporate authorities under this power, conveys only the lot so cleansed, according to its boundaries at that time ; and although the lease describes the lot with enlarged boundaries, the excess does not pass to the lessee.

4. *Title by prescription.*—To constitute a title to land by prescription, or twenty years' continuous possession under claim of title, which will raise the presumption of a grant, there must be acts of exclusive ownership, in hostility to the rights of all other persons : the exercise of rights in common with the public generally, as in the case of a public street or wharf, is not sufficient.

5. *Title to shore on tide-waters.*—The title to the shore, on all tide-water streams, resides in the State, for the benefit of the public ; and its use by the public, for the purposes of commerce, is not only permissible, but in accordance with the trust annexed to the title.

APPEAL from the Chancery Court at Mobile.

Heard before the Hon. ADAM C. FELDER.

The bill in this case was filed on the 13th September, 1870, by Paul A. Boulo and Philip J. Boulo ; and sought to enjoin and restrain the defendant, the New Orleans, Mobile, and Chattanooga (now Texas) Railroad Company, from subject-

ing to its own uses a narrow strip of land in the city of Mobile, between Commerce street and the river, and forming a part of the river front. The complainants claimed this strip of land, according to the allegations of their bill, both by documentary title, and by prescription, founded on twenty years' continuous adverse possession under claim of title. Their documentary title was deduced from a lease made by the corporate authorities of the city of Mobile, on the 8th June, 1831, by which a lot in the city, known as the "Wilson lot," was leased, for the term of seventy-five years, to Robert E. Centre ; which lease was made an exhibit to the bill, and purported on its face to be executed by the corporate authorities of the city of Mobile, under authority conferred on them by an act of the legislature amending the city charter, approved January 15, 1831. This act may be found in the Session Acts of 1830–31, p. 54. The 6th section of said act, under which said lease purported to be made, is in these words : "*Be it further enacted,* that the said board of mayor and aldermen shall have power to require the fencing or inclosing of any vacant lot within the limits of said city ; to require lots to be cleansed and cleared of all such nuisances as may to the said board seem necessary to be removed ; to require side-walks to be made, fronting any vacant lots within the corporate limits ; and in every instance, where no owner or agent can be found to make such cleansing and improvements, the said board may cause the same to be done, and let out such lot or lots for such term of time as will cover the expenses incurred in so cleansing or improving any such vacant lots."

In this lease to Centre, the lot is described as follows : "Bounded on the east by the Mobile river, on the north by Church street, on the west by Water street, and on the south by Hogan's lot ; having a frontage on the said river of about thirty feet, a front on Church street of about two hundred and twenty feet, and a front on Water street of about thirty feet, more or less, being the same lot known as the 'Wilson lot.'" The lease contained the following recitals : "*Whereas,* according to the provisions of an act of the general assembly of the State of Alabama, and the *seventh* section thereof, entitled 'An act to alter and amend the charter of incorporation of the city of Mobile,' the said mayor and aldermen did, on the 16th January, 1831, declare by public advertisement, in the '*Mobile Commercial Register,*' a paper printed three times each week in the said city of Mobile, that a certain lot, situated between Church street and Hogan's property, and extending from the east side of Water street to the Mobile river, and about thirty feet in width, to be a public nuisance;

and did, in the same advertisement, require the said lot to be filled up with good earth, sand, or shells, on or before the 8th day of March ensuing ; otherwise, that the said filling would be let at public auction to the lowest bidder, at 12 o'clock M. of said 8th day of March, in front of the mayor's office : *And whereas* the said lot had not been filled at the time specified by the said advertisement, that the mayor did proceed and let out the filling of the said lot, at the time specified as aforesaid, to Thomas Byrnes, for the sum of four hundred dollars : *And whereas* the said Thomas Byrnes did fill up the said lot to the satisfaction of the said mayor and aldermen, and according to the conditions of a bond given for that purpose, bearing date the 9th March, 1831, and the said mayor and aldermen did pay to the said Thomas Byrnes the said sum of four hundred dollars, as will more fully appear upon record in the mayor's office of said city of Mobile: *And whereas* the said mayor and aldermen did cause an advertisement to be inserted in the *Mobile Patriot*, a paper printed in said city, three times in each week, on the 3d day of June aforesaid, that unless the owner, agent, or claimant of the said lot, on or before the 8th day of June in the year aforesaid, would come forward, and pay to the said city authorities the said sum of four hundred dollars, with all other charges and assessments upon the said lot, that they would, at 12 o'clock M. on the said day, in front of the mayor's office, proceed to lease the said lot for the lowest number of years, according to the authority aforesaid, for the purpose of indemnifying the said city for the expenses in and as aforesaid : *And whereas* no person did appear to pay the said charges, that the said lot was struck off, at public auction, to Robert E. Centre, for seventy-five years, for the sum of four hundred and fifty dollars and eighty-nine cents, he being the lowest bidder for the same," &c.

In 1840, Robert E. Centre having died, his heirs conveyed the unexpired term of the lease to James Magee, under whom the plaintiffs claimed by intermediate conveyances, as more particularly stated in the opinion of the court. Magee's deed to the complainants, dated the 2d August, 1869, containing full covenants of warranty, described the lot in controversy as follows : " Also, another lot of land on the south side of Church street, and east side of Commerce street, beginning at the south-east intersection of Church and Commerce streets, and running southwardly, along Commerce street, thirty-two feet ; thence eastwardly, and parallel with Church street, to the river ; thence northwardly, along the Mobile river, until it intersects the southern line of Church street ; and thence westwardly, along Church street, to the place of

beginning." Magee's deed to the complainants conveyed another lot, on the west side of Commerce street, which he held by the same title, and on which the complainants afterwards erected a brick store-house; and they alleged, in their bill, that the lot in controversy "is the river front of said first piece, and the outlet thereof to the Mobile river, the highway of commerce of said city, and of all other people engaged in commercial pursuits therein."

The plaintiffs' title by prescription was thus stated in the bill: "During all of said time, said persons from whom your orators derived said title and possession, as aforesaid, and your orators' predecessors, were in the full, quiet, and uninterrupted possession of the same, as your orators are informed and believe; that said Magee, at the time they purchased from him, was in possession, claiming the same under said title; and your orators, on making said purchase, went into the possession of the same, and never heard of any one setting up or claiming any right, title, or interest in the said property, until within the last few days," &c., when an agent of the defendant called on them to negotiate for a purchase of the property. The bill further alleged, that the defendant "has moved a pile-driver in the river, immediately in front of said land, and is now engaged in preparing to drive piles or logs in the shallow water in front of and on said land, with the intention of making a water bulk-head, and filling in the same with earth, and using the same for the purpose of said company, and has taken possession of said land by force, and against the consent of your orators, without compensation to them, and thus obstruct the entrance and exit to their other said property by way of said river."

The chancellor sustained a demurrer to the bill, for want of equity; but his decree was reversed by this court, at its June term, 1872, and the cause remanded. The case was never reported, though an able opinion was delivered by B. F. SAFFOLD, J., a copy of which is set out in the record, with the certificate of reversal. After the reversal of the cause, the defendant filed an answer, denying the plaintiffs' title to the lot in controversy, whether founded on the documentary title set out in the exhibits to the bill, or on prescription; averring that the lot in controversy was a part of the shore of Mobile river, was formerly covered by the water, and was reclaimed by the corporate authorities of the city of Mobile and the lessee of the city wharves, who erected a bulk-head, or barrier of timber in the water, and filled up the space intervening between it and the west side of Commerce street, with earth, shells, &c. As to the lot occupied by the complainants on the west side of Commerce street,

known as the "Wilson lot," the answer averred that it was one of the lots of the Fort Charlotte Reserve, which were surveyed and sold, under an act of the United States congress, approved April 20, 1818; and that it did not extend to the river, and did not include the strip of land here in controversy. As to the lease of the lot by the corporate authorities of the city of Mobile, the answer denied its validity, on the ground that the requisitions of the statute were not complied with, and denied that it passed any interest in the lot in controversy. The answer admitted that the defendant had entered on the strip of land in controversy, and claimed the right to appropriate it for the purposes of its road, under authority from the United States, under its act of incorporation by the legislature of Alabama, and under an ordinance of the corporate authorities of the city of Mobile.

On final hearing, on pleadings and proof, the chancellor dismissed the bill, holding that the complainants had failed to make out a case for equitable relief; and his decree is now assigned as error.

BOYLES & OVERALL, for appellants.—1. The shores of navigable waters, and the soil under them, were not granted to the United States by the constitution, but were reserved to the several States respectively; and each new State, on its admission into the Union, acquired equal sovereignty and jurisdiction with the others.—*Pollard v. Hagan*, 3 Howard, 212; *Goodtitle v. Kibbe*, 9 Howard, 471; *Munford v. Wardwell*, 6 Wallace, 423. For this reason, the act of congress, approved May 26, 1824, which attempted to grant to the city of Mobile certain lots which were below the usual highwater mark in 1819, was held to be invalid, as the title was in the State, and not in the United States.

2. The State held this title in trust for the public, and could make any disposition of it that might be thought best, providing it did not interfere injuriously with commerce and navigation. In 1831, the municipal authorities of Mobile were authorized by statute to have lots filled up, and to lease them out to reimburse the city for the outlay. This was done, and the property so leased was described in the lease, as in all the subsequent conveyances, as bounded east by the Mobile river. The lessee had a license from the State to fill up the shore, and he did so; and he, and those who went into possession under him, erected valuable improvements on the property, and made further encroachments by banking into the water. These acts were not only acquiesced in by the sovereign, but recognized and ratified; and taxes were assessed and collected against the property, by the city,

county, and State. The license from the State to fill in the shore, when executed, became irrevocable.—Angell on Tide Waters, 196; 1 Black's (U. S.) Rep. 23; 7 Wallace, 289; 2 Zabr. 441; 34 N. J. L. 532. As against the State, when the low lands were filled in, and valuable buildings erected on them, the fee to the soil passed:—Com. Digest, *Grant*, E, 1; 6 Mass. 332, 435; Cro. Eliz. 704; 3 Mason, 280; 22 Vermont, 480; 3 Mass. 352; 1 Pick. 180; 2 Dane's Abr. 696; Vattel, 175.

3. In the United States, there are many places where the tide ebbs and flows, which, without the aid of human art and industry, afford not the slightest advantage to the public; such as flats, marshes, and ground covered with water only at full tide. The public receive no detriment from the reclamation and private appropriation of such lands, but are gainers by it, since they are thereby accommodated with landing-places, new streets, &c. Hence, there has been a general custom to make accessions to land in this manner, " without any suspicion of the right and authority to do so, and, consequently, without obtaining any formal and express sanction of the sovereign, or legislative power."—Angell on Tide Waters, 126, 127, 131. The principle that, where the tide ebbs and flows, the waters are *prima facie* of common right to the public, " is to be restrained by a reference to public necessity and general utility."—1 Pick. 180. When the State permits the conversion of the premises from water into land, the right of the public to their use, as a part of the channel of the river, is thereby relinquished; and when reclaimed, and covered with buildings, they become part of the bank, the property of the adjoining proprietor, and no longer subjected to the public easement which affected the channel.—37 Barbour, 71, 97; 36 Barbour, 126.

4. The State is estopped from setting up any title against these plaintiffs, having recognized their title for more than twenty years, by assessing and collecting taxes against the property.—43 Ala. 297; 2 Paine, C. C. 545; 4 Allen, Mass. 406; 49 Maine, 491; 2 Black's (U. S.) Rep. 722.

5. After twenty years' possession, a grant from the State will be presumed.—1 Stewart, 287; Cowper, 217; 11 Peters, 41; 9 Wheaton, 490; 4 Howard, 297; 7 Wheaton, 59.

6. The act of congress approved March 2, 1868, authorized defendant to build and maintain bridges over the navigable waters of the United States, along the route of defendant's railroad, " between New Orleans and Mobile;" and declared that such bridges, &c., when constructed, " in accordance with this act and the laws of the several States through whose territory the same shall pass," shall be

deemed lawful structures. But the United States did not own the premises here in controversy, as above shown, and, of course, could not grant to the defendant any right or interest in them; and the premises are *in* Mobile—not between Mobile and New Orleans. The defendant cannot, then, under this act of congress, claim any right to seize and shut up any part of the shore front in Mobile, and appropriate it as private property.

7. Nor can the defendant claim such a right under its charter granted by the legislature of Alabama. The charter only grants the right to use lands owned by the State, and requires compensation to be paid to the owners of all private lands. The charter does not purport to confer on the defendant the right to take possession of the river front in Mobile, for near two hundred feet, and appropriate it to its own private uses; and if it were clearly intended to confer such right, the grant would be void, because the legislature has no such power.—11 Peters, 638; 12 Pick. 467; 6 Cowen, 551; 25 Wendell, 462; 13 Wendell, 373; 2 McL. 376; 2 Johns. Ch. 162; 10 Barbour, 367; 9 Wallace, 241; 12 Amer. Rep. 156; *Yates v. Milwaukee*, 10 Wallace, 497; 34 N. J. L. 532; 8 Watts, 434; 22 Wendell, 425; 5 Barn. & Ald. 91; 57 Maine, 273; 4 Dallas, 147; 5 Ham. 401; 20 Johns. 90; 10 Johns. 236; 1 McCord, 543; 4 Burr. 2162; 5 Hill, 170; 13 Wallace, 179; 2 Amer. R. 59.

8. The ordinance passed by the corporate authorities of Mobile, which has, however, since been repealed, could not grant this right to the defendant.—*East Hartford v. Hartford Bridge Co.*, 10 Howard, 535; 12 Wheaton, 54; 14 N. Y. 506; 19 Md. 51; 3 Duer, 119; 7 Cowen, 605; 6 Wheaton, 597; 11 Peters, 422; 10 Wallace, 497; 5 Porter, 279.

9. Neither the State, nor any municipality created by it, can authorize the establishment or continuance of a public nuisance.—Angell on Tide Waters, 132–34; 32 Cal. 365; 27 Texas, 68; 1 Abbott, U. S. 158; 98 Mass. 431; 20 Md. 157; 31 Missouri, 181: 16 C. B. (N. S.) 222, 430.

10. As to the right of a private individual to enjoin a public nuisance, when it works a private injury, see the former opinion of this court in this case; also, 5 McL. 425; 13 Howard, 519; 9 Howard, 10; 2 Black, 425; 1 Oregon, 73; 2 Amer. Law Times, 156; 5 Porter, 79; 27 Ala. 104.

Geo. N. Stewart, *contra.*—1. The complainants show no valid documentary title to the premises in dispute. There is no legal proof of the alleged lease; and if proved, it would have no validity. To divest a man of his property by a summary proceeding, a strict compliance with the requisitions

of the statute must be shown; but there is no proof here that any of the provisions of the statute were complied with. Nor did the law authorize the filling up of lots covered by the water of the river, so as to reclaim land from the water. It is a perversion of the object of the law, as well as of its language, to put such a construction upon the power "to clear and cleanse vacant lots." Even if the lease were valid, the complainants in this case can claim nothing under it. The lease conveyed a mere chattel interest, which, on the death of the lessee, vested in his administrator, and not in his heirs, under whom the complainants assert title.

2. The premises in dispute are not within the boundaries of the lease, which contains no terms passing appurtenant rights; nor can land pass as appurtenant to land. A conveyance of land will not pass land covered by water.—1 Howard, 503. Nor can they claim any riparian rights under the patent of Wilson, because the east boundary of that grant, as the map shows, did not extend to the river. Where a street intervenes, or any intervening space exists, between the lot granted and the river, no riparian right attaches to the lot.—*Saulet v. Shepherd*, 4 Wallace, 502; *The Schools v. Risley*, 10 Wallace, 91. No riparian right can attach to a leasehold estate. It attaches only to the seizin, and not to a mere chattel interest.

3. The title to the soil, in lands covered by the ebb and flow of the tide, is in the State, and is held by it in trust for the benefit of the public.—13 Howard, 212. In the exercise of this trust, the legislature is the sole judge of the uses to which it shall be applied, subject only to the restrictions imposed by the constitution of the United States. In the exercise of this power, the State allows wharves to be built into the water, in the interest of commerce and navigation; but the fee in the soil remains in the State. The right to construct wharves is allowed to riparian owners, in preference to others, to prevent confusion; but it is not a title, or absolute right. When a proper improvement has been made, it is protected; if not proper, it is a nuisance, and indictable as such. The State has the right to cut off the riparian right, as it is called, when the privilege has not been exercised; and may devote this public property to necessary beneficial purposes. This is not taking private property for public use, but simply applying trust property to the uses imposed by the trust, while the land and private rights of the owner remain untouched.—*Eaton v. Railroad Company*, 51 N. H. 504; 2 Selden, 522; 12 Barbour, 616; 23 Md. 432; 34 N. J. 532; Amer. L. T. Rep., March, 1873, p. 135; *Ib.* April, 1873, p. 153. The State had the power,

then, to authorize the river space in question to be applied to railroad purposes as to a public institution; and it has done so.—3 Wallace, 663, 713; 2 Stew. & P. 199; 31 Ala. 91.

4. The complainants failed to show any acts of exclusive ownership in themselves, as against the public at large, or inconsistent with the rights of the public.

BRICKELL, C. J.—The complainants, averring ownership and possession of a lot on the east side of Commerce street in the city of Mobile, filed this bill, to enjoin the defendant from entering on, and taking possession thereof, for the uses of its road. The defendant avers, that the complainants had neither title to, nor possession of the place in controversy—that it is part of the shore of Mobile river, and that the right and authority to enter and construct its road thereon is conferred by its act of incorporation.

The jurisdiction of a court of equity to enjoin the commission of trespasses on real estate, though of comparatively recent origin, is now firmly established. The court does not in+erfere, merely because the party of whom complaint is made is a trespasser. The interference is for the protection of the right, legal or equitable, of the invasion of which the party appealing to the court can rightfully complain. Very much the same rule obtains, as in ejectment at common law: the plaintiff must recover on the strength of his own title, not because of the weakness of the defendant's. An injunction should never be issued, unless the right is clear, and the injury not capable of prevention otherwise. Privity of estate, or of contract, not appearing between the parties, or the complainant not showing a clear legal or equitable title, the court will not intervene by injunction, to prevent a trespass.—Kerr on Injunction, 295; *Duvall v. Waters*, 1 Bland, 277; *Storm v. Mann*, 4 Johns. Ch. 21; *Irwin v. Dixon*, 9 How. 28; *Eichelkamp v. Schnader*, 45 Mo. 505; *Routh v. Driscoll*, 20 Conn. 579; *Falls River, &c. v. Tibbetts*, 31 Conn. 569. In a case analogous to the present, an application for an injunction to stay waste, said Lord ELDON: "I dare not grant an injunction in this case. The bill states a title sufficiently, if it was sufficiently verified. But the affidavits disclose the case no further, than that it may or may not be true; and I am of the opinion the court ought not to grant an injunction, unless there be positive evidence of title."—*Davis v. Leo*, 6 Vesey, 784.

In the state of the pleadings—the answer explicitly denying the title and the possession of the appellants—the first inquiry is into the title and fact of possession. No privity of estate, or of contract, between the parties, is averred, The

whole theory of the bill is, that the defendant, having power to take and appropriate lands in the construction of its railroad, has entered on, and is appropriating the complainants' land, without making compensation, and disclaiming all duty or liability to make it. The title of the complainants is founded on documentary evidence, and an averred long, continuous, uninterrupted possession. The place in controversy is a slip between two wharves, the one on the north known as 'Church street wharf,' the one on the south as 'Hogan's wharf;' its western boundary is Commerce street, from which it is separated by a bulk-head, or barrier; and on the east it extends into the Mobile river. Whether the whole slip is not, at high tide, covered by the water of the river, is a fact about which the evidence conflicts. We incline to the opinion that, immediately at the barrier, or bulkhead, land has been formed, which is not usually covered by water at high tide. Originally, Commerce street, at this place, was covered by high tides, if not at all times; and the water extended to, if not beyond, the storehouse of the complainants, on the western side of the street. The municipal authorities of the city of Mobile gradually reclaimed the land now forming the street; and the labor of proprietors, asserting riparian rights, and exercising them in the construction of wharves into the river, on the east of the street, contributed.

The documentary evidence of title, introduced by the parties, may be thus stated. On the 20th April, 1818, an act of congress was approved, directing the survey and sale of Fort Charlotte, which stood to the south of Government street, in the then town of Mobile. The act required the land to be laid off into lots, with suitable streets and avenues. The survey was made, and nine blocks, or squares of lots, with intervening streets, or avenues, were laid off. The lots were numbered, and a sale of them by number was made. James Wilson became the purchaser of lot number three, in square number two; and in 1823, having made payment of the purchase-money, received from the United States a patent, in which it is described as follows: "Lot number three, in square number two, being thirty feet front, situate on the ancient site of Fort Charlotte, in the town of Mobile and State of Alabama, according to the official plat of the survey of said lands, returned to the general land-office, by the surveyor-general." A copy of this plat, properly certified, is exhibited with the answer; and thereby it appears, that, though squares one, two, and three, of the Fort Charlotte lots, fronted on Mobile river, a space of land intervened between the squares and the river, and no lot extended to the river.

In 1831, the corporate authorities of the city of Mobile were, by the general assembly, empowered to require the owners of vacant lots within the city "*to cleanse and clear*" *them;* and if the owner could not be found, *to cleanse and clear them*, and lease them for such term as would pay the expense of the improvement.—Pamph. Acts 1830–1, p. 54. The authorities, under this statute, declared the lot of Wilson a nuisance, and caused it to be filled with earth, &c., and then leased it, to pay the expense incurred, for a term of seventy-five years, to Robert E. Centre. In the lease, the lot is described as "bounded on the east by the Mobile river, on the north by Church street, on the west by Water street, and on the south by Hogan's lot; and having a front on the said river of about thirty feet, a front on Church street of about two hundred and twenty feet, and a front on Water street of about thirty feet, more or less." This is a very inaccurate description of the lot, corresponding with its true description, at the time of the sale by the United States, in the western and southern boundary only. It seems to be conceded, that subsequent to Wilson's purchase, and prior to the lease, Church street was changed, so as to embrace lots one and two, of square number two, of the Fort Charlotte plat, thus becoming the northern boundary of Wilson's lot, number three. Lot number four of the same square, south of Wilson's lot, was patented to John B. Hogan and others, and seems thereafter to have been known as the "Hogan lot," as it is styled in the lease. Water street was the western boundary of square number two, and the space of land intervening between it and the river, marked on the plat, was the eastern boundary.

Making the boundary on the east Mobile river, as is done by the lease, instead of this space of land, it is probable, was under the supposition, that the city of Mobile had title, under the act of congress of 1824, between high-water mark and the channel of the river. If such was the supposition, it was erroneous; and the lease, if valid (a question on which it is not necessary to express an opinion), operated only the creation of a term in the Wilson lot. That lot only the corporate authorities had power to lease. Its boundaries could not be enlarged, and the lessee could only take so far as the United States had patented to Wilson.

The lot remained vacant, after the lease, until 1840, when the heirs of Centre conveyed the remainder of the term to James Magee. In this, and all subsequent conveyances, the description of the premises is as two lots; the one "on the west side of Commerce street, beginning at the south-west corner, or intersection of Commerce and Church streets, and

[Boulo v. New Orleans, Mobile & Texas Railroad Company.]

running northwardly along Commerce street, thirty-two feet; thence westwardly, and parallel with Church street, one hundred and seventeen feet; thence northwardly, and parallel with Commerce street, to Church street; thence westwardly, along Church street, to the beginning; *also*, another lot of land, situate, lying and being on the south side of Church street, and east side of Commerce street, beginning at the southern intersection of Church and Commerce streets, and running southwardly, along Commerce street, thirty-two feet; thence eastwardly, and parallel to Church street, to the river; thence westwardly, running northwardly along said river, till it intersects the southern boundary of Church street; thence westwardly, and along Church street, to the beginning." Magee erected on the lot, on the west side of Commerce street, a brick storehouse, and then conveyed to Joseph Hall, in trust for the use of his wife Henrietta, and his daughter, Florence Emily Magee. Hall and Mrs. Magee having died, and Florence Emily being of full age, in 1859, she reconveyed to her father, said James. In 1869, he sold and conveyed to the complainants.

As we have said, originally the water of the river covered Commerce street, and that street was reclaimed by the municipal authorities. The Wilson lot not extending to the river, but separated from it by a strip or space of land, did not embrace the place in controversy. The patent to Wilson is the source of complainants' title ; and of consequence, they have, so far as is shown in the record, no documentary evidence of title—no grant, or conveyance, sufficient to pass this slip. Though it is described in the conveyance from the Centres to Magee, and from Magee to the complainants, title did not pass, because it did not reside in the several grantors, or any of them.

This seems to be conceded by the complainants ; but it is insisted that they, and those under whom they claim, for more than twenty years, have been in the undisturbed and undisputed possession of the place, under a claim of right. If the fact exist, it is right and just they should be protected in the possession.—*Varick v. Corporation of N. Y*, 4 John. Ch. 53. The presumptions of the law are in favor of the legality of men's acts ; and therefore it attributes a lawful origin to long-continued use and enjoyment.—3 Stark. Ev. 1203. After a careful and deliberate examination of the evidence, we are not satisfied that the complainants, or those under whom they claim, have ever had any exclusive possession of the slip, or subjected it to individual use. No occupant or proprietor of the lot on the west side of Commerce street, prior to the appellants, is shown to have made any use of

it. The only use of which it has been capable, since the construction of the wharves, has been a mooring or landing place for smaller vessels. That is the only use the complainants are shown to have made of it during the short time of their ownership and occupancy of the lot on the west side of Commerce street. But the public at large, all navigating the river, made the same use of it; and to such public use it has been appropriated, since the wharves were constructed. When, or by whom, the bulkhead, or barrier which separates it from Commerce street, was erected, is not shown. It was essential to the preservation of this slip, as a suitable landing place for vessels, and when it would fall into disrepair, it was repaired by the proprietor of the wharves. In 1852, a storm injured, if it did not destroy the bulkhead, and it was rebuilt by Gage, the lessee of the wharves. In 1865, it was repaired, and placed by Gage and Hurtel, then lessees of the wharves, in the condition in which it was when the complainants purchased. If the slip was ever subjected to individual use, it was by the lessees or proprietors of the wharves, as an accessory to them; and there is no privity of title between them and the complainants. The land which accumulated at the bulkhead was used by the lessees of the wharves—they gave permission for its occupancy; and when not occupied under their permission, by the cargo or freight they permitted to be discharged there, so far as it was on a level with the street, those traversing the street used it as a part of the street. No dockage, no rent for the use of the slip, was ever claimed by the complainants, or those whom they succeed in estate. Not an act of ownership was ever exercised over it. Its existence, and the public use of it, probably gave additional value to the storehouse and lot of appellants on the west side of Commerce street, and the adjacent lots of other proprietors. Trade may have been drawn to that side of the street, by the existing condition of things. Water transportation may have been, and doubtless was, the chief source of the commerce of Mobile. Individuals purchased property, with the view of its present location to existing sources of commerce. These change, and will change, in the course of time, and those who suffer loss from the changes have no claim to compensation, beyond that which may be received in the diminution of public burthens on them, which are elsewhere increased, because of the increase of values, and the transfer of these sources.

The several conveyances after the lease certainly disclose a claim of right to the place in controversy. A mere claim will not avail, as the foundation of a presumption of title. Concurring with it, there must be an open, notorious pos-

session, challenging the right of all who could claim adversely. The title to the *locus in quo*, which is part of the shore of a tide-water stream, resides in the State. Its use for the purposes of commerce, by the public, is not only permissible, but is the trust annexed to the title. Such use is consistent with, and not in opposition, or hostility to the title. Presumptions of grant, or of a license, when an exclusive, continuous appropriation to private use has existed for twenty years, may be indulged. But an exclusive, hostile possession, illegal without license or grant, is essential to create the presumption. .

We cannot affirm that the defendant had entered on and taken, or was about entering on and taking, land which was the property of complainants. That affirmation not being clear from the evidence, the decree of the chancellor, refusing an injunction, and dismissing the bill, was correct, and must be affirmed.