# Hammond *v.* Winchester.

*Bill for Injunction against Trespasser on Mineral Lands.*

1. *Parol lease of mineral rights for two years.*—A verbal lease, or an unsigned writing in the form of a lease, granting the right to enter on lands and mine ore for the term of two years, is void under the statute

[Hammond v. Winchester.]

of frauds (Code, § 2121, subd. 5), and can not amount to more than a parol license, which is revocable.

2. *What constitutes color of title.*—An unsigned writing can not constitute color of title, when the law requires an executed written contract; and a party who enters under such unsigned writing, is a trespasser.

3 *Injunction against trespass on mineral lands*—The owner of mineral rights in lands may maintain a bill in equity for an injunction against a trespasser, who, having entered without authority, is mining and selling ore, and is insolvent; the injury being in its nature irreparable.

APPEAL from the Chancery Court of Etowah.

Heard before the Hon. S. K. McSPADDEN.

The bill in this case was filed on the 6th May, 1886, by Samuel M. Winchester, against Albert Hammond, and sought to restrain and enjoin the defendant from mining iron ores on a certain tract of land, or removing the ores which he had already dug; the complainant claiming to be the owner of all the ores and mineral rights in and on the lands, and alleging that the defendant entered without authority, under an agreement or negotiations for a lease with one J. E. Line, who was the son-in-law of the complainant, and that he was insolvent.

Under the negotiations between the defendant and said Line, a writing was drawn up, a copy of which was made an exhibit to the bill, and which was without date or signatures, in these words : " This agreement between Samuel M. Winchester, of the first part, and Albert Hammond, of the second part, *witnesseth*, that the party of the second part agrees to mine iron ore for the party of the first part, in fraction 20, sec. 34, town. 11, range 5, in Etowah county, near Attalla, commencing on the 1st November, 1884, on the following terms : Party of the first part is to pay party of the second part the sum of $1.43 per ton of 2268 lbs., delivered on the cars at Attalla ; said weights to be subject to correction by the weights of the Chattanooga Iron Company, and the ore to be accepted by it before payment; and if not accepted by said company, party of the first part agrees to take all that is marketable of the ore delivered by party of the second part. Said party of the second part is to be paid on the 25th day of each month, for all ore mined and delivered, as above, during the preceding month ; and he binds himself to mine and deliver, as above, at least 500 tons each and every month, if not providentially hindered. He is to do the work in a skilled and workmanlike manner, and is to have rights-of-way and use of timbers that may be necessary to mine ore on said lands, but for no other purpose. This contract not to be transferred without leave of party of the first part, and to be in force for two years from the first November ; but, if the property is not man-

[Hammond v. Winchester.]

aged properly, and the ore mined with due care, or if the party of the second part fails to get out an average of. 500 tons per month, and deliver the same as above, then this contract to be null and void, at the option of the party of the first part. The books of the party of the second part are to be at all times open to inspection of party of first part, or his agent. From the $1.43 per ton, mentioned above, the party of the first part is to deduct and retain 15 cents on every ton, as a royalty, and pay the balance ($1.28 per ton) to the party of the second part, on the 25th day of each month, for ore delivered in the month previous. Party of the second part agrees, at the expiration of this lease, or when the same is forfeited, to leave all entries, not worked out, in good condition, with sufficient pillars and props to make them safe ; and will peaceably surrender the possession of said lands and ore-beds, to the party of the first part, at said expiration or forfeiture, together with all improvements put thereon, except iron rails, tools, and other personal property of said party of the second part. If either party violates this contract, the other can declare it forfeited at his option."

The complainant alleged in his bill, that he had no knowledge or notice of the negotiations between the defendant and said Line, until some time in February, 1885, when the writing was presented for his approval and signature, and he was informed that the defendant had already entered on the land, and had commenced mining operations; that he refused to approve or sign the writing, and notified the defendant of his dissent and refusal ; that the defendant discontinued his mining operations for a few months, but re-commenced in August, 1885, and had continued them up to the filing of the bill, notwithstanding repeated notices and objections on the part of the complainant ; that the defendant was insolvent, and that the injury to the complainant was irreparable. The defendant filed an answer to the bill, admitting his entry on the land, and his mining operations ; alleging that he entered under authority of his contract or negotiations with Line, and with the knowledge and acquiescence of the complainant; that he never heard of any objection or dissatisfaction on the part of the complainant, until January, or February, 1885, when he had been in possession for five or six months, and had expended more than $1,000 in his outfit and machinery, and as much more in permanent improvements on the property; that he then refused to surrender possession, asserting his rights under the contract, and continued his mining operations, except at short intervals when there was no demand for

[Hammond v. Winchester.]

the iron ores, without further objection from the complainant, until the injunction in this case was served on him. He alleged that he had paid the complainant the royalty reserved on all the ores sold; alleged that the complainant had allowed him to proceed, without objection, until the business became profitable, and then delayed filing his bill until, taking advantage of the time at which the terms of the court was held, he could, by a temporary injunction, deprive the defendant of all profits he might earn during the remainder of the lease ; and denied that he was insolvent, or that he was selling the ores already mined and stored until the controversy between him and the complainant was determined. He demurred to the bill, for want of equity, and because the complainant had an adequate remedy at law ; and also submitted a motion to dismiss the bill, for want of equity.

The chancellor overruled the demurrer, and the motion to dismiss ; and, on final hearing, on pleadings and proof, rendered a decree for the complainant. Each of these decrees is now assigned as error.

WM. H. DENSON, for the appellant.—(1.) The complainant, not being in possession, can not maintain this suit, even if the defendant is to be regarded as a trespasser.—*Bracken v. Preston,* 44 Amer. Dec. 412-20 ; *Peop'e v. Simonson,* 10 Mich. 335 ; *Akrill v. Selden,* 1 Barb. 316; *Bell v. Chadwick,* 71 N. C. 329 ; *Enfield T. B. Co. v. Railroad Co.,* 42 Amer. Dec. 716. (2.) But the defendant entered in good faith, under color of title, and has continued to hold under claim of right, with complainant's knowledge ; and he can not be regarded as a trespasser.—*Hackensack Imp. Com. v. Midland Railroad Co.,* 22 N. J. Eq. 94 ; *Ra lroad Co. v. Devaney,* 2 Amer. Rep. 608-24. Whether Line was Winchester's agent, and had authority to make a contract for him, and whether Winchester acquiesced in and ratified the acts of Line, are legal questions, as to which the defendant is entitled to a trial by jury.—*Bank v. Plannett's Adm'r,* 37 Ala. 222 ; *McClung v. Spotswood,* 19 Ala. 165 ; *Martin v. Brown,* 75 Ala. 442 ; *Law v. Cross,* 1 Black, U. S. 533 ; *Parker v. Winn. Co.,* 2 Black, U. S. 545 ; High on Injunctions, § 8, note 2 ; *Lehman, Durr & Co. v. Shook,* 69 Ala. 495 ; *Routh v. Driscoll,* 52 Amer. Dec. 352 ; *Poindexter v. Henderson,* 12 Amer. Dec. 550 ; *Storm v. Mann,* 4 Johns. Ch. 22 ; 19 Vesey, 153 ; 6 Vesey, 51 ; *Duval v. Waters,* 18 Amer. Dec. 350 ; *Riggs v. Fuller,* 54 Ala. 141; *Munson v. Munson,* 73 Amer. Dec. 693.   (3.) That the complainant had an adequate remedy at law, even if he required a temporary injunction in aid of his action, see *Bracken v.*

[Hammond v. Winchester.]

*Preston,* 44 Amer. Dec. 412 ; *Irwin v. Davidson,* 7 Mining
Rep. 237 ; 14 Md. 376 ; 6 Johns. Ch. 497 ; 66 Maine, 51 ;
51 Miss. 522. (4.) The complainant knew in February,
1885, after he had refused to sign the written contract, that
the defendant had entered into possession long before, and
was working the mines, to his irreparable injury, as he now
alleges ; and his only effort to stop this, as shown by the
testimony, was to request his informant to notify defendant
to cease his operations, which was not done. And on the
1st April, 1885, when Line was authorized to notify defend-
ant to quit working the mines, there was a contract be-
tween Line, defendant and Christopher & Stewart, by which
defendant was to raise ore from the mines, the royalty on
which was to pay off the drafts due to Christopher & Stew-
art from the Southern Lumber Company, of which Winches-
ter was president and principal stockholder, and which
in fact was composed of him and Line. This required two
thousand tons, and could not be accomplished before the
1st August; but it was done, and the drafts paid. Win-
chester was chargeable with notice of all facts known to
Line, his agent.—11 Wall. 356 ; 27 Ala. 336. It was his
duty at once to make a distinct disavowal of the defendant's
right to work the mines, to have him so notified, and to
take proper steps to enforce his own rights. By his acqui-
escence, delay and *laches,* while his property was being de-
veloped by the defendant, he has forfeited the right to com-
plain, and is estopped and barred.—2 Greenl. Ev. §§ 65-7;
2 Herm. Estoppel, §§ 1061-63 ; 12 Wall. 681 ; 26 N. J. Eq.
468. A court of equity will not interfere by injunction, in
favor of a party who has been guilty of unreasonable de-
lay. —High Inj. § 7 ; *Logansport v. Uhl,* 50 Amer. Rep. 109 ;
*Easton v. N. Y. Railroad Co.,* 24 N. J. Eq. 57. The rule is
applied with great strictness in cases regarding mineral
property, or other property of a speculative nature.—*Pren-
dergrast v. Turton,* 8 Mining Rep. 167 ; *Clegg v. Edmondson,
Ib.* 205 ; *Ernest v. Vivian, Ib.* 205 ; *Oil Co., v. Marbury,* 91
U. S. 591 ; Kerr on Fraud, 302-06 ; *Law v. Cross,* 1 Black,
U. S. 533 ; *Leaming v. Wise,* 7 Mining Rep. 41 ; *Morgan v.
McKee,* 3 *Ib.* 128 ; *Coal Co. v. Lloyd,* 8 *Ib.* 166 ; 23 Cal. 83 ;
91 U. S. 55 ; *Grymes v. Sanders,* 93 U. S. 55 ; 12 N. J. Eq.
78 ; 39 *Ib.* 203 ; 10 Cush. Mass. 252 ; 28 Geo. 117 ; *Delano
v. Blake,* 25 Amer. Dec. 617 ; 12 Johns. 300 ; 68 Mo. 229 ;
39 N. J. Eq. 203 ; 7 Wisc. 503 ; 14 Maine, 57 ; 1 Denio, 69.

DORTCH & MARTIN, *contra,*—(1.) The jurisdiction of a
court of equity to enjoin a trespass on real estate, on
the ground of irreparable injury, is well established

[Hammond v. Winchester.]

*Boulo v. N. O. Railroad Co.*, 55 Ala. 480; *Chambers v. Ala. Iron Co.*, 67 Ala. 359; 2 Story's Equity, §§ 928-9. (2.) The defendant entered without color of right, and has continued to hold in spite of repeated notices to quit; and he can only be regarded as a trespasser. If Line had authority, as agent of Winchester, to make the alleged contract under which Hammond entered, it would be void under the statute of frauds.—Code, § 2121, subd. 5. But the writing shows on its face that it was intended for the signature of Winchester; and, as he refused to sign it, no contract was ever consummated. The defendant can claim no benefit from his own wrong.

STONE, C. J.—It may be stated as fact, that, during the whole of the time Hammond was working the mines which are the subject of this suit, and for some years before, Winchester was the sole owner of the minerals in his individual right. All the testimony bearing on this question, and every attendant circumstance, tend to prove this, while there is not a semblance of testimony which points in the opposite direction. Even Hammond himself is forced to acknowledge this fact, for all the right of possession he claims, he derived from Line, charged by him to have been the agent of Winchester, strengthened by the acquiescence and *laches* he imputes to the latter. The real contention in this case requires us to determine, if we can, the true relation between Winchester and Hammond, and precisely what was done, which the appellant relies on as clothing him with the rights of a lessee. We will first consider the question last named.

Winchester was father-in-law to Line. He, Winchester, resided in Chattanooga, Tennessee, and Line in Gadsden, Alabama. They were each stockholders in a corporation engaged in the manufacture of lumber at the latter place, Winchester being the president, and Line the resident managing agent. In a former lumber enterprise in which they had been engaged as partners, doing business at Attalla, five miles distant from Gadsden, they, Winchester & Line, had mined some iron ore, and had dealt somewhat in iron ore. There was no proof of such dealing by the corporation at Gadsden, nor was there proof that any of Winchester's mineral lands had ever been let to others, to be worked on the royalty principle, or in any other way. Some time between August and November, 1884, Line and Hammond had a negotiation, looking to the taking of a lease by the latter from Winchester, on certain unoccupied or unseated mineral lands belonging to the latter, Ham-

mond to pay a royalty of fifteen cents per ton on all the ore he should mine. The proposed lease was to commence November 1, 1884, and was to continue two years. Line had the writing drawn up, and submitted it to Hammond, who made some pencil notes on it, suggesting alterations, and returned it to Line.

The testimony most favorable to complainant, and the writing drawn up proves it to be true, shows that neither party thought the contract of letting was then complete. It shows more. Neither party acted on the theory, or postulate, that Line was the agent of Winchester, authorized to give a lease. The writing was not drawn in form to be executed through or by Line as agent. It contemplated execution by Winchester himself, and all the proof, both positive and circumstantial, goes far to show—in fact does prove—that the contract was not to considered made and executed, until it should be signed by Winchester. Hence the wish and expectation, indulged by Hammond, as shown by his pencil memoranda, that Winchester would insert other stipulations, which, it seems, Line had been unwilling to insert. Why desire Winchester's signature, if Line was the agent, authorized to grant the lease? And why expect additional stipulations, if the contract of letting had been made and concluded?

We hold that no contract of letting was entered into, for the following reasons : *First*, the lease, when made, was to be for two years. To be binding, such contract must be in writing, subscribed by the party sought to be charged, or by some other person thereunto lawfully authorized in writing.—Code of 1876, § 2121 ; 3 Brick. Dig. 510, 512. In this case, there was no writing signed by anybody. *Second*, all the testimony, including the writing itself, proves that none of the parties considered that the contract was fully made and executed ; nor would be, until certain alterations of the writing, suggested by Hammond, were considered by Winchester, and the writing signed by him.

It follows necessarily from these indisputable premises, that Hammond did not enter by virtue of any lease that was valid in law. And this would be the inevitable result, even if we were to hold that Line was the agent of Winchester, authorized to give a lease of the premises. What he did was, neither in law nor in fact, the granting of a lease. It was, at most, an oral assurance by Line that he could and would obtain, or endeavor to obtain from Winchester, a lease, such as the writing expressed ; and having confidence that he would be able to do so, he instructed Hammond to take possession of the premises. If we

concede that Line had authority to grant the lease, or even that Winchester himself had had the writing drawn, and then refused to sign it, what was done could not rise to a higher dignity than the granting of a parol license to enter and mine ore, with all the incidents and infirmities attending that relation.—*Riddle v. Brown*, 20 Ala. 412.

There is another fact which may be considered in determining whether a contract was treated or acted on as made. The unsigned writing, insisted on as the contract, is not a lease in the ordinary form, reserving rent. It contemplates a letting of the possession and use of the premises to Hammond, not that he might mine ore, and sell it on the market, paying so much royalty per ton for the privilege. Its provisions are, that he, Hammond, will dig the ore, and load it on cars for Winchester, at one and 43-100 dollars per ton, payable monthly, with a rebate of fifteen cents per ton royalty, for the unmined ore. The ore, when mined and loaded, was to be Winchester's, while Hammond would be entitled to wages at one and 28-100 dollars net per ton, to be paid monthly. The labor done by Hammond under the contract, in no sense agrees with the writing. It is not pretended that Hammond received, or demanded from Winchester, payment for mining the ore, or that he considered the mined ore as belonging to Winchester. On the contrary, he claimed and disposed of it as his own, with no right or interest reserved in Winchester, save the stipulated royalty of fifteen cents per ton. There is nothing in the continued occupation and working of the mine by Hammond, even if known and acquiesced in by Winchester, which tends to show that the latter ratified the unsigned written lease. As we have said, this could amount to nothing more than a parol license.

It is urged that Hammond did not enter as a trespasser, but under color of title. An unsigned, incomplete writing can not be color of title, when the law requires written contract executed, to make it good.—3 Brick. Dig 355, § 345.

It is further urged before us, that Winchester, by his tardiness, non-interference, and *laches* misled Hammond, and authorized him to continue his occupation and mining operations, believing he had authority therefor. We have scrutinized the testimony bearing on this question, and it fails to convince us that Winchester was guilty of any *laches*, or of any tardiness in repudiating the proposed contract, as evidenced by the writing. On the contrary, he promptly refused to execute the lease, and took several steps to notify Hammond of his refusal. The very fact that the

contract was not signed, was itself a warning to Hammond that he was working another's land, without any lawful authority therefor. The record fails to show any authority for imputing *laches* or negligence to Winchester. On the other hand, it is shown that Hammond peremptorily refused to quit, or surrender the possession, when notified to do so.

It is contended that equity has no jurisdiction in this case. We can not agree to this. The pleadings and proof alike show a clear case for injunction. Winchester owned only the minerals, and their loss to him would be in its nature irreparable.—Story Eq. Jur. §§ 928-9 ; 1 High. Inj. §§ 328, 667, 730 ; 2 Dan. Ch. Pr. 1631-2 ; *Boulo v. N. O., M. & Tex. R. R. Co.*, 55 Ala. 480 ; *Chambers v. Ala. Iron Co.*, 67 Ala. 353.

While Hammond exhibited undue persistence, after he should have known he was working under no valid lease, still this case presents some features of hardship. Both Line and Hammond appear to have had confidence that Winchester would execute the lease, the terms of which they had in a measure agreed on. Having such confidence, Hammond commenced working the property with the knowledge and approbation of Line. Line's relationship to Winchester, doubtless, strengthened that confidence. There is, however, a failure of convincing proof that Line was the agent of Winchester, authorized to make the lease of his property ; and action taken upon misplaced confidence can not supply the missing element in the defense attempted to be made.

The decree of the chancellor must be affirmed.