## MULLIGAN v. HOLLINGSWORTH et al.

(Circuit Court, W. D. Missouri, W. D. January 15, 1900.)

1. LANDLORD AND TENANT—PAYMENT OF RENT—GIVING OF NOTE.
Where a lease provided that the lessee should execute his note for the amount of the rent, and should also pay the taxes on the land, "as additional rent," the execution of the note constitutes payment of the rent, so far as relates to the rights of the parties under the lease.

2. SAME—BREACH OF LEASE—WAIVER OF FORFEITURE.
To render the acceptance of rent by a lessor a waiver of a right of forfeiture on account of a prior breach of the lease by the lessee, it must have been with knowledge of the breach; and evidence that a son of the lessor, not shown to have been his agent, had such knowledge, is not sufficient to charge the lessor with it.

3. SAME—CONTINUING BREACH.
The use of land by a lessee, or those claiming under him, for a purpose prohibited by the lease, which under the statute renders the lease forfeitable, constitutes a continuing ground of forfeiture; and the acceptance of rent by the lessor with knowledge of such use is not a waiver of the right of forfeiture on account of its subsequent continuance.

4. SAME—SUBLEASE—ASSIGNMENT OF LEASE.
To constitute a sublease, the lessor must retain some reversionary interest in the premises; and a lease by a lessee to a third person, extending beyond his own term, is not a sublease, but is in legal effect an assignment of his lease, within the meaning of Rev. St. Mo. 1889, §§ 6368, 6369, which make an assignment without the consent of the lessor a ground of forfeiture.

This is an action of ejectment, in which the jury, by direction of the court, returned a verdict for the plaintiff. On motion for new trial.

Daniel B. Holmes, for plaintiff.

J. M. Davis, L. H. Waters, and Wm. Leeper, for defendants.

PHILIPS, District Judge. The plaintiff, an aged man, residing in Lexington, Ky., for many years has owned a section of land in Caldwell county, in this district, which, the circumstances indicate, he regarded as an investment, and intended as an inheritance for his children. To this end, he seems to have desired that the land

should be so used as to return a small income, but should not be so used as to exhaust or impoverish the soil. For a number of years prior to 1889 he had rented it to one Kenney, to be used as grazing land. On the 1st day of March, 1889, he made a written lease thereof to said Kenney for a term of one year, to expire on the 1st day of March, 1890, in payment for which Kenney executed to him a note for $600, to be paid on the 1st day of March, 1890. This lease contained the following provision: "It is agreed that no part of the land shall be cultivated, and that the land shall alone be used for grazing during the year aforesaid." Without any written renewal, the tenant held over from year to year, which was but a continuation of the written lease from year to year. It is quite apparent from the correspondence between these parties that Mr. Mulligan reposed the utmost confidence in the friendship and integrity of Kenney, and relied upon him to well guard his property. By reason of extreme old age, the physical and mental powers of Mr. Mulligan in the past few years became greatly impaired, so that he was little capable of attending to any business affairs. About two years ago he became so enfeebled, bodily and mentally, that his business was taken charge of by his wife, under power of attorney from him. In the fall of 1898 his son James Mulligan, of Lexington, Ky., of his own motion came to Missouri, to see and ascertain the condition of said property. Then, for the first time, he discovered that Kenney on the 23d day of January, 1894, had made a written lease of this land to J. A. Linville and Jacob Switzer until the 1st day of March, 1898, at an annual rental of $1,400, and that during this period the land had been plowed and cultivated each year, and crops of corn raised thereon; and this lease was continued by written indorsement thereon for the year 1898, ending March 1, 1899; and on the 28th day of February, 1899, the said Linville, Switzer, and one Austin leased a part of said premises to the defendants, R. W. Hollingsworth and W. A. Hollingsworth, for one year from March 1, 1899, to March 1, 1900, and they made a like lease to other persons of the residue of said section. This was done with the sanction of said Kenney. After giving 10 days' notice to the tenants to quit, the plaintiff on April 7, 1899, instituted this action of ejectment. On a trial before a jury, the jury, under direction of the court, returned a verdict for the plaintiff on the issue of the right to the possession, and the jury assessed the damages, and fixed the rental value of the premises. The defendants have filed a motion for new trial.

Section 6368, Rev. St. Mo. 1889, declares that:

"No tenant for a term not exceeding two years, or at will, or by suffrance, shall assign or transfer his term or interest, or any part thereof, to another without the written assent of the landlord; neither shall he violate any of the conditions of his written lease, nor commit waste upon the leased premises."

The evidence showed that five successive crops of corn had been raised upon this land, which constituted waste, as its effect was to impoverish the soil and injure the land. Such cultivation was also a clear violation of the conditions of the written lease between plaintiff and said Kenney. The succeeding section (6369) declares that:

"If any tenant shall violate the provisions of the preceding section, the land-lord, or person holding under him, after giving ten days' notice to quit possession, shall have a right to re-enter the premises and take possession thereof, or to oust the tenant, sub-tenant or under-tenant by the proper procedure."

The principal contention of defendants' counsel is that, notwithstanding the acts aforesaid amounted to a violation of the conditions of the lease and to a commission of waste, the plaintiff has lost his right of action under said section 6369, for the reason that after the forfeiture the plaintiff received from Kenney the annual rental. This contention is predicated of the fact that said James Mulligan, while in Missouri in the fall of 1898, learned of said violations of the lease, and that he required the tenants to secure the payment of the note given by Kenney to the plaintiff for the rental for the year 1898. The evidence shows that said Kenney did send a draft drawn by some home bank on some bank in Lexington, Ky.; and as Kenney's note was thereafter returned to him, paid, the presumption is to be indulged that the plaintiff received the money. There is no question of the correctness of the general proposition of law that if, after a forfeiture accrued against the tenant, the land-lord, with knowledge of the forfeiture, receives rent money from the tenant, he thereby waives the forfeiture. There are several complete answers to this contention. In the first place, it cannot be said, as a matter of fact and law, that the plaintiff, in receiving payment of said note, collected from Kenney the rental for said land. In the written lease between plaintiff and Kenney there is no stipulation for the payment of rental at the end of the rental year, but the covenant of the lessee was as follows:

"The second party [that is, Kenny] agrees to, and has this day executed to said first party [that is, the plaintiff] his promissory note for the sum of six hundred dollars, of even date herewith, and due and payable one year after date, to wit, on the 1st day of March, 1890, with interest at the rate of ten per cent. per annum from maturity until paid, which note said second party is to promptly pay at maturity."

This stipulation went with and qualified every subsequent renewal from year to year, so that as matter of law the only covenant of the lessee in this respect was to execute his promissory note, which he did on the 1st day of March each year, for the sum of $600, which he was to pay in this instance on or before the 1st day of March, 1899. Therefore the note itself was taken in payment of the rent at the time it was delivered, March 1, 1898. "Payment" is defined in Rawle's Revised Edition of Bouvier's Law Dictionary as "the fulfillment of a promise, or the performance of an agreement." Black, in his Law Dictionary, says, "By 'payment' is meant, not only the delivery of some money, when such is the obligation of the contract, but the performance of that which the parties respectively undertook, whether it be to give or to do." The lease contains no promise to pay any money as rent for the land, but the covenant by Kenney was to give his note for a certain sum of money, payable one year after date. The lease contains the further clause, immediately following the one above quoted, to wit, "Said second party agrees to pay, as additional rent, all the taxes assessed on said land for and during the term aforesaid," etc. This confirms

the idea that the note itself was given and accepted as rent, as the covenant to give the note is immediately followed by the stipulation to pay certain taxes as "additional rent," thus clearly indicating that the rent reserved consisted in the giving of the note and the payment of the taxes. "That is payment which the parties contract shall be accepted as payment. It may be made in anything else than money." And. Law Dict. "If a note is taken in absolute payment of rent, the landlord's only remedy is upon the note." 2 Tayl. Landl. & Ten. (8th Ed.) § 565. As said by Chief Justice Marshall in Sheehy v. Mandeville, 6 Cranch, 264, 3 L. Ed. 215:

"That a note, without a special contract, would not, of itself, discharge the original cause of action, is not denied. But it is insisted that if, by express agreement, the note is received as payment, it satisfies the original contract, and the party receiving it must take his remedy on it. This principle appears to be well settled. The note of one of the parties, or of a third person, may, by agreement, be received in payment."

The express agreement here was that in consideration of the lease the lessee was to give his note for $600, which he did, and the fact of its being payable at a subsequent date could not alter the effect of its acceptance for rent. The very fact that the note was taken implied that it was to be paid at a subsequent date. More than this, the acceptance of rent money after the forfeiture, in order to constitute a waiver, must have been done with knowledge on the part of the payee of the facts constituting the forfeiture. The evidence in this case is not sufficient to show that the plaintiff, when the note was paid, had any knowledge of such fact. The burden of this proof rests upon the defendants; and in view of the great outrage done this old man by Kenney in taking advantage of his age and enfeebled condition in renting his land for farming purposes, in violation of the express covenant in his lease, whereby he was receiving $800 per annum more than the rental he was paying the plaintiff, and impoverishing the soil, it is not too much to say that the defendants should be held to strict proof on this issue. The uncontradicted evidence is that at the time of the payment of this note, and for two years prior thereto, the plaintiff was little more than an imbecile; and it does not appear from the evidence that James Mulligan at the time he was on the premises in 1898 was either acting as agent for the plaintiff, or that he communicated to him the facts he then learned. Unless he was then clothed with full authority as the agent of the plaintiff, he was under no obligation to communicate to him any information he may have learned; and the most that can be inferred from the visit of James Mulligan to the premises is that he came of his own motion, as a person interested in the property of the owner. This situation is well illustrated by the case of Nash v. Birch, 1 Mees. & W. 402, in which ejectment was brought against the tenant on forfeiture of the lease, which obligated the tenant to erect a certain shop front within a prescribed time, with the right of re-entry for breach. Because of the landlord's illness, his son acted for him, with knowledge of breach of the covenant, and he did acts which the court was of opinion would have amounted to a waiver of the forfeiture if the son had

sufficient authority from the landlord. There was no evidence that the landlord himself had knowledge of the breach. The court held that the forfeiture had not been waived. Lord Abbinger, C. B., said:

"But the court think there is very great difficulty as to the question of the son's agency, and we are of opinion that there is not sufficient evidence of his authority to waive the forfeiture."

Park, B., said:

"The whole turns on the point whether the son had authority to waive the forfeiture. It seems to me that the son had probably an authority to receive the rent, but not to grant a new lease by waiving a forfeiture of the former one. If it had been proved that the father had notice of the alterations. and he had still. allowed the son to receive the rent, the forfeiture might have been waived. But that was not proved, and the question of waiver does not, therefore, directly arise in this case. If it had, the authorities cited show that this was a lease voidable at the election of the landlord. Then I think an absolute, unqualified demand of rent by a person having sufficient authority would have amounted to a waiver of the forfeiture, and it would have been like the case I cited from Croke's Reports [Cro. Eliz. 3]."

In Jackson v. Schutz, 18 Johns. 174, the lease in question contained a covenant against the right of assignment, with the right of re-entry for breach. The lessee assigned to one Wager, and the landlord thereafter brought ejectment. The evidence showed that the landlord's agent collected rent from Wager two successive periods, and gave him a receipt "in full for rent." There was no evidence that the agent had communicated his knowledge of the assignment to the landlord. The court ruled against the contention that these receipts of rent constituted a waiver of the forfeiture. The court said:

"It was proved that the lessee, by indorsement on the original lease, assigned the premises to one David Wager on the 1st day of September, 1812, without license, and without offering pre-emption to the lessors, and without paying one-tenth of the price of such assignment. An attempt was made to prove by the subsequent receipts of rents that the forfeiture had been waived, but that ground of defense failed, because there was no evidence that the lessors were then conusant of the assignment. We are therefore compelled to decide upon the validity and effect of the covenant before recited."

Clearly enough, this ruling was predicated of the proposition that, even where there is an agency to collect rent, that of itself is not sufficient to confer upon the agent the power to waive the forfeiture. James Mulligan, who visited this land, was not even deputized by the landlord, the plaintiff, to collect rent, nor to make any arrangement whatever with the lessees, nor did he collect rent; nor does it appear that he informed the plaintiff of the acts done constituting the forfeiture. The evidence does not even show that James Mulligan was acting for his mother, or that he informed her of the acts of forfeiture. Although she may have held a power of attorney from her husband to attend to his business, he was not under judicial guardianship, and was yet, in contemplation of law, sui juris. More than this, even if it could be said that the rental was received after knowledge of the forfeiture, the continued use of the land thereafter for farming purposes would have created a continuing forfeiture, existing at the time the notice to quit was given, and ejectment was brought. In Farwell v. Easton, 63 Mo. 446, the lessees,

as trustees of the order of Good Templars, held under a lease which required the premises to be used for the Templars, and for a law and land office. One of the lessees opened on the premises a justice of the peace court. It was held that his use of the property for a justice court was a prohibited use, and during its continuance a cause of forfeiture was not waived by the receipt of rent after the original breach. The court said:

"If the use of the premises by Easton for court purposes was a prohibited use, the continued use thereof for such purposes was a continuing cause of forfeiture, of which the landlord cannot be precluded from taking advantage, by reason of his having received rent which accrued after the breach was originally committed."

So, in Ambler v. Woodbridge, 9 Barn. & C. 376, the court said:

"The conversion of the house into a shop is a breach, complete at once, and the forfeiture thereby incurred is waived by a subsequent acceptance of rent. But this covenant is that the room shall not be used for certain purposes. There was therefore a new breach of the covenant every day during the time that they were so used, of which the landlord might take advantage."

At the time the action of ejectment in the case at bar was brought, the defendants were in possession; and they defend themselves under the lease from Kenney to Linville et al., which lease expressly provided that Kenney "does by these presents lease and to farm let" the premises in controversy. And the lease from Linville et al. to the defendants contained this express provision: "The parties of the first part [that is, Linville et al.] reserve the stalk fields for pasture; the corn to be gathered not later than January 1st, 1900." Therefore the conclusion is inevitable that for the year 1899 these defendants were continuing to cultivate the lands for farming purposes, and raising corn. In the absence of any attempt on the part of the defendants to a contrary showing, it is clearly to be presumed that when this action was brought the defendants were in possession, using the land for the purposes contemplated by their lease; and as a part of the rent reserved by Linville et al. was the stalk fields from the annual crops, which crops were to be removed "not later than January 1st, 1900," to enable Linville to turn his stock in upon the stalk fields, the conclusion follows that the lease from the plaintiff to Kenney was being forfeited during every day of the occupancy of the land by the defendants, which, as a part of the rent, required them to raise a crop of stalks for Linville's cattle.

While it is not deemed essential to the support of the verdict in this case that the discussion should go further, yet it is but respectful, perhaps, that the court should give expression to its view respecting the contention made in the brief of one of defendants' counsel, that the lease from Kenney to Linville et al. was a sublease, as distinguished from the assignment mentioned in said section 6368 of the Revised Statutes; that, as there is no provision in the lease from the plaintiff to Kenney prohibiting a subleasing, no forfeiture can arise from the mere act of subleasing. The lease from Kenney to Linville et al., of March, 1894, was originally for a period of four years; and it was extended from March 1, 1898, for a period ending March 1, 1899, from which it is apparent that the term for

which Kenney let to Linville et al. extended beyond his own term of lease from the plaintiff. This being so, the transaction takes away the character of a sublease, and amounted to an assignment. It is a well-settled principle of law governing the relation of landlord and tenant that, to constitute a sublease, the lessor must retain some reversionary interest in the premises sublet. "If the tenant parts with the demised premises for the whole of his term, although his deed purports an underlease, yet it is, in legal effect, an assignment, and operates as a breach of his covenant." 1 Wood, Landl. & Ten. (2d Ed.) p. 714. "It is essential to a lease that some reversionary interest be left in the lessor; for if by the instrument purporting to be a demise he parts with the whole interest in the premises, or makes a lease for a period exceeding his own term, it will in either case amount to an assignment of the term." 1 Tayl. Landl. & Ten. (8th Ed.) § 16. The motion for a new trial is denied.