## BIG SIX DEVELOPMENT CO. v. MITCHELL.

### (Circuit Court of Appeals, Eighth Circuit. April 22, 1905.)

### No. 2,095.

1. TRESPASS—INJURY TO MINES—EQUITY JURISDICTION.

Complainant, after forfeiture of a mining lease, filed a bill to cancel the lease as a cloud on his title, to establish his right of possession, and to enjoin the lessee from mining ore on the leased premises; alleging the lessee's breach in failing to timber the drifts, subsidence of the surface, a forfeiture, a demand, and defendant's refusal to surrender possession, and its intent to continue mining operations on the land as before. Held, that the bill was not merely one to remove a cloud on plaintiff's title, but was sustainable as a bill to restrain a threatened and continuous injury, altering the character of the land, and tending to occasion irreparable loss and damage.

2. SAME—EXTENT OF JURISDICTION.

Where a bill in equity was maintainable to enjoin the lessee of a mine from committing waste and destroying the property as a mine, though plaintiff was not in possession, the court, for the purpose of preventing a multiplicity of suits, was entitled to retain the bill for further relief, and cancel the lease as a cloud on title, quiet the title, and determine the right of possession.

[Ed. Note.—For cases in point, see vol. 19, Cent. Dig. Equity, §§ 104–114.]

3. SAME—FORFEITURE.

Where a bill to enjoin a lessee from committing waste on a mining property, and to cancel the lease as a cloud on title, etc., alleged that complainant had declared a forfeiture of the lease, before the bill was filed, for breach of conditions, the bill was not objectionable on the ground that its purpose was to enforce a forfeiture, which could not be done in equity.

4. SAME—WAIVER.

Where the ground of forfeiture of a mining lease was the continued failure of the lessee to work the mine in a workmanlike manner, and to support the ground so that it would not cave, and the defendant's violation of the covenants of the lease requiring such support, etc., continued up to the time a temporary injunction restraining the further operation of the mine was issued, the fact that the landlord accepted rent or royalties due under the lease after notice of forfeiture, or after suit brought to recover the property, did not constitute a waiver of the forfeiture.

5. SAME—ADEQUATE REMEDY AT LAW.

In a suit by a landlord to cancel a mining lease as a cloud on his title, to establish his right of possession in the premises, and to enjoin the

lessee from mining ore on the leased premises, because of its breach of the lease in operating the mine in an unworkmanlike manner, so as to cause the surface of the ground to cave, etc., the bill was not demurrable on the ground that complainant had a complete and adequate remedy at law by an action of forcible entry and detainer.

6. SAME—APPEAL—FINDINGS.
    On appeal from a decree in chancery, it will be presumed that the findings of the trial judge on conflicting evidence are correct, unless an obvious error has intervened in the application of the law, or some grave mistake has been made in the consideration of the facts.
    Hook, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Western District of Missouri.

John W. McAntire and John W. Halliburton (Heywood Scott, Samuel McReynolds, and Frank Hagerman, on the brief), for appellant.

Thomas Dolan and S. D. Mitchell, for appellee.

Before SANBORN and HOOK, Circuit Judges, and RINER, District Judge.

RINER, District Judge. This was a bill in equity brought by S. Duffield Mitchell, a citizen of the state of Pennsylvania, against the Big Six Development Company, a corporation organized under the laws of the state of Missouri, to cancel a lease as a cloud upon plaintiff's title to certain lands, to establish his right of possession therein, and to enjoin the lessee from mining ore in the leased premises. The lease was dated May 31, 1898, and, by its terms, was to run 10 years from date. It provided that the parties of the second part should commence the work of sinking shafts within 10 days after the date of the lease—

"and shall keep and have on said tract of land, sufficient pumps and machinery to drain the same of water, so as to permit efficient mining thereof, and shall properly operate the same, and shall increase the capacity thereof from time to time as same becomes necessary."

"The said parties of the second part, their successors and assigns, shall mine said land in a good, thorough and workmanlike manner, shall keep all shafts and drifts well and securely timbered and supported, and shall not remove such timbers and supports so as to endanger the ground or to permit the same to cave or fall in. Mining shall be carried on in good faith continuously, and shall not be suspended at any time except on written permission of the party of the first part.

"All lead and zinc ores shall be cleaned and prepared for market on said land, and no rough or crush stuff shall be removed therefrom to be cleaned, nor shall minerals or crush stuff from other land be brought or cleaned on said land without the written permission of the said party of the first part."

"The said parties of the second part, their successors and assigns, shall keep in a book a correct account of all lead and zinc ores mined, the kinds and weights thereof, to whom sold, and the price received therefor, which book shall be open to the inspection of the party of the first part at all reasonable times."

"The said parties of the second part, their successors and assigns, shall pay to the party of the first part, at the Bank of Joplin, Missouri, on Monday of each and every week, as rent and royalty, twelve (12) per cent. of the market value of all ores mined and sold during the preceding week, and shall furnish at the time of said payment a written statement of all ores sold, to whom sold, and the price received therefor."

"The parties of the second part, their successors and assigns, shall have the right to erect all necessary buildings and machinery on said land for the purpose of mining and draining, crushing and cleaning ores thereon, and to remove the same at the expiration or forfeiture of this lease, except timbering and other materials necessary to support the ground, which timbering and improvements immediately on their being placed in the ground shall become the property of the party of the first part. All uses of the ground not inconsistent with thorough and proper mining, as herein required, are hereby reserved to the party of the first part."

"Any failure at any time on the part of the parties of the second part, their successors and assigns to comply with and perform in good faith the requirements of this lease shall end and determine the same, and said party of the first part, his heirs and assigns may declare an ouster and forfeiture of said lease and may re-enter and hold said demised premises without recourse to law in as full and complete a manner as if this lease had never been made.

"Nor shall the failure of the party of the first part, his heirs or assigns, to enter upon and take possession of said premises on account of the failure of the parties of the second part to keep and perform the conditions and agreements herein contained, be construed to be a waiver of the rights of the party of the first part to declare an ouster and re-enter and forfeit said demised premises for any other and subsequent breach of the requirements of this lease."

The bill alleges that the plaintiff was the owner in fee simple and in possession of a tract of land situate in Jasper county, Mo., and described as the north half of the northeast quarter, and the southeast quarter of the northeast quarter, of section 4, township 27, range 32, containing 120 acres, more or less; that on the 31st of May, 1898, plaintiff executed and delivered a mining lease upon the southeast quarter of the northeast quarter of section 4, containing 40 acres, the same being a part of the 120 acres above described; that, by deed of assignment duly executed and acknowledged by the parties of the second part to the lease, they conveyed all of their interest and title therein to defendant; that defendant subdivided the tract of land into mining lots, and subleased the same to miners and mining companies, who have been conducting mining operations thereon; that the defendant, by its mining rules and regulations, declared and posted according to law, imposed upon its several sublessees the duties and obligations imposed upon it by the lease with reference to sinking and driving shafts, timbering, supporting the surface of the land, preventing the surface from caving or falling in, pumping and draining water, cleaning and preparing for market all ores produced from the mine; that defendant performed none of these acts, nor did it own any machinery, pumps, or buildings located on the land; that the defendant kept an account of all lead and zinc ores mined, the kind and weight thereof, to whom the same was sold, and paid to the plaintiff the royalty due thereon, as provided by the terms of the lease. It is then alleged in the bill that:

"Defendant corporation, its sublessees and licensees, have failed to comply with and perform the conditions and requirements of said lease, in this: That it and they have failed and refused to keep the deeper drifts in said land drained of water, and have failed to mine the ground thereof, and have failed to mine said ground in a work-man-like manner; and have removed and caused to be removed a pillar or pillars in said ground, which, in mining said ground, had been left to support the surface and prevent the same from caving or falling in, and have failed to properly timber and secure the drifts of said

ground from caving, and have failed to timber certain shafts securely and properly, by reason of which failure the ground has subsided, caved, and fallen in, to the great detriment and damage to said land. That by reason of its failure to comply with the requirements and conditions of said lease, the defendant has forfeited the same, and the said lease, by its terms, has ended and determined; and the plaintiff, electing to enforce said forfeiture as against defendant, on account of said failure to comply with the conditions and requirements of said lease, did on the 7th day of July, 1903, declare said lease forfeited, and made re-entry on said described land, declared an ouster of the defendants therefrom, and posted upon said land a notice of forfeiture, * * * and duly served same on defendant on said 7th day of July, 1903, by delivering a true copy thereof to J. W. Allen, president of defendant. That notwithstanding the re-entry by plaintiff on said land by the terms of said lease, at his election, to re-enter and oust defendant from said land for forfeiture of said lease by reason of failure to comply with its conditions and requirements, defendant, its officers and agents, refused to surrender said lease, and claim and assert rights thereunder adverse to plaintiff, and threaten to continue to claim and assert said rights to the said land of plaintiff, and threaten to continue to mine or cause said land to be mined, and to take the ores, rock, and earth therefrom, to the irreparable damage of plaintiff."

It is then alleged that the defendant corporation was organized solely and only to take over and hold the title to the plaintiff's lands; that it has no other property or assets than the lease; that at the organization the defendant corporation received nothing but the lease as property, in full payment for its entire capital stock; that the defendant divides its royalty, earnings, or profits derived under said lease on plaintiff's land among its stockholders, when received; that the defendant is insolvent; and that plaintiff's remedy at law would be inadequate. The plaintiff then alleges that the lease creates a cloud upon his title to the land in controversy, and prays that the court may decree that the defendant has no interest in or title to the lease; that the title of the plaintiff to the land in controversy is unaffected by the lease or any claim of the defendant; that the lease be declared to be no longer in force and effect in favor of the defendant, and that it may be canceled, annulled, and surrendered into the possession of the plaintiff; and that the defendant, its officers, servants, and agents, be enjoined from asserting any claim under the lease, and from continuing in possession of the land in controversy. To this bill the defendant demurred, and the demurrer was overruled. It then filed an answer, the testimony was taken, and the case came on for final hearing, resulting in a decree declaring the lease a cloud upon plaintiff's title, establishing his right of possession in the property, and enjoining the lessee from mining ores in the leased premises.

It was insisted by appellant that a court of equity had no jurisdiction, upon the pleadings and evidence, to grant the relief given by the court in this case. And at the argument it was said that this bill should not be maintained: (1) Because a bill for an injunction can only be maintained, where the title is disputed, after a trial at law, or after an action at law has been commenced; (2) because a cloud upon the title cannot be removed unless the complainant is in possession; and (3) because it seeks to enforce a forfeiture.

The trespass here complained of, as disclosed by the record, is not an ordinary case of trespass upon lands, of temporary duration,

but, as we think the evidence shows, was a continuous trespass, which threatened to destroy the character of the property as a mine, and would render the plaintiff's interest therein valueless. Threatened and continuous injuries to mines, quarries, timber growing upon lands, buildings located thereon, or other improvements of a permanent character, are enjoined, because, as has been said, such acts "alter the character of the property, and also tend to destroy it, and occasion irreparable loss and damage." Courthope v. Mapplesden, 10 Ves. 290; Scully v. Rose, 61 Md. 408; Erhardt v. Boaro, 113 U. S. 537, 5 Sup. Ct. 565, 28 L. Ed. 1116; Jerome v. Ross, 7 Johns. Ch. 315, 11 Am. Dec. 484; Hammond v. Winchester, 82 Ala. 470, 2 South. 892; Snyder v. Hopkins, 31 Kan. 557, 3 Pac. 367. In such cases the threatened injuries are to the res, and diminish the value of the property itself, and an injunction will be granted to prevent the continuing waste or continuing trespass, although the plaintiff is not in possession, and although the legal title has not been settled or questioned by an action at law. Story's Eq. Jur. § 860; Union Pac. R. Co. v. Kansas Elevator Co. (C. C.) 17 Fed. 200; Earl Cupper v. Baker, 17 Ves. 128; Iron Co. v. Reymert, 45 N. Y. 703; Snyder v. Hopkins, 31 Kan. 559, 3 Pac. 367; Lacustrine Fer. Co. v. L. G. & Fer. Co. et al., 82 N. Y. 486; Oolagha Co. v. McCaleb, 68 Fed. 87, 15 C. C. A. 270; High on Inj. 736; Alleghany Oil Co. v. Snyder, 106 Fed. 764, 45 C. C. A. 604; Peck v. Ayres & Lord Tie Co., 116 Fed. 273, 53 C. C. A. 551; Logan Nat'l Gas Co. v. Great So. Gas & Oil Co., 126 Fed. 623, 61 C. C. A. 359.

If the only relief sought by the bill in this case was to remove the cloud upon plaintiff's title, it may well be doubted whether the bill could be sustained. Orton v. Smith, 18 How. 263, 15 L. Ed. 393; Frost v. Spitley, 121 U. S. 552, 7 Sup. Ct. 1129, 30 L. Ed. 1010. But the bill goes further, and seeks to enjoin the defendant from committing waste and destroying the property as a mining property. In such a case jurisdiction in equity attaches, even where the plaintiff is not in possession. And having obtained jurisdiction for that purpose, the court may, for the purpose of preventng a multiplicity of suits, retain it for further relief, and may remove a cloud upon the title, quiet the title, and determine the right of possession.

In the Elevator Case above cited, Mr. Justice Miller said:

"When either party, lessor or lessee, claims that acts have been done which render the continuing of the relation no longer proper, such party can go into a court of equity, on general principles, and ask to have that lease set aside, canceled, and annulled. In that case the court of equity sits, holding the scales of justice evenly between the parties, and may say that it believes that such acts have been done by the lessee, for instance, as ought to determine the agreement. * * * And the court will declare the agreement at an end, and set aside and annulled, and will make such orders as seem proper and right."

We think, both upon reason and authority, that in a case such as this, where the injury is to the res (that is to say, where irreparable mischief is being done or threatened, going to the very substance of the estate), a court of equity has jurisdiction, not only for the purpose of restraining waste or threatened trespass, but, having acquired jurisdiction for that purpose, it may also proceed to settle

the question of title and to remove the cloud; and this was the view taken by the Circuit Court.

While the bill in this case is not carefully drawn, yet we think sufficient is presented by the record to invoke the jurisdiction.

It is also urged that the bill cannot be maintained because it is a bill to enforce a forfeiture, and equity never lends its aid to enforce a forfeiture or penalty. But as we understand it, the theory of the bill is not that, but is that the forfeiture was complete before the bill was filed, that the lease was dead, and that the defendant was threatening and was guilty of a continuous trespass. We think the bill may well be maintained upon this ground. Met. Land Co. v. Manning, 98 Mo. App. 248, 71 S. W. 696. While the right of a lessor to determine, without recourse to the courts, a lease of real estate, as forfeited, and re-enter upon the premises, is limited to the most technical terms and conditions upon which the right is to be exercised, yet we think there can be no doubt but what the right exists in a case where the terms of a contract and the acts complained of justify such a course. He must, it is true, be able to point out specifically some clear act in violation of the terms of the lease, which will authorize the forfeiture. The Circuit Court found that the plaintiff had made a sufficient showing in this regard, and, from our examination of the record, we are not prepared to say that the conclusion reached was erroneous.

It is also urged that after the notice of forfeiture, and on the 5th day of October, 1903, the plaintiff received and accepted the rents or royalties due under the lease, and that this act upon his part constituted a waiver of the forfeiture. The ground of forfeiture, as we understand the record, was the continued failure of the defendant to mine in a workmanlike manner, and to support the ground so that it would not cave, and the defendant's violation of these covenants of the lease continued up to the time the temporary injunction was issued. We think the receipt of the rent or royalty was not a waiver of the forfeiture. A waiver rests upon an estoppel, and there was no estoppel here: (1) Because a continuing breach of the covenants of a lease is not waived by receipt of rent. Farewell v. Easton, 63 Mo. 446; Taylor's Landlord & Tenant, 500. And (2) because the receipt of rent after the institution of a suit to recover the property is not a waiver. 18 Am. & Eng. Enc. of Law, 387; Cleve v. Mazzoni (Ky.) 45 S. W. 88.

It is also insisted that the bill cannot be maintained because there was a complete remedy at law by an action for forcible entry and detainer. Our examination of the record leads us to the conclusion that this contention cannot be sustained. Such an action would not have prevented the extraction of the ore and removal of the earth, so that continuous cavings would have occurred, during the time spent in the various courts in reviewing the trial for forcible entry and detainer by successive appeals until a final decision was reached. On the other hand, we think it is a case where there would be no adequate remedy at law, because the law, as stated by the Supreme Court, in regard to the jurisdiction in suits in equity of courts of the United States, in view of the statute which declares

that there shall be no remedy in equity where there is a plain, adequate, and complete remedy at law, is that the remedy at law must be as efficient to the ends of justice and its complete and prompt administration as the remedy in equity, and we think the record clearly shows in this case all of the injuries that could be inflicted upon the property might well be inflicted before such a proceeding could have effect.

We have carefully examined the evidence set out in the record, and, while it is somewhat conflicting, we think it is entirely sufficient to sustain the findings of the Circuit Court. Applying the rule so well stated by Judge Sanborn, of this court, in the case of Manhattan Life Ins. Co. v. Wright, 126 Fed. 82, 61 C. C. A. 138, that "the legal presumption is that the finding and decree of a court of chancery are right, and they should not be disturbed or modified by an appellate court unless an obvious error has intervened in the application of the law, or some grave mistake has been made in the consideration of the facts," we think it does not so clearly appear that the defendant was not violating the terms of the lease, in failing to properly support the surface of the ground and to properly conduct its mining operations, that the finding of the lower court should be reversed. The evidence, we think, not only permitted, but compelled, the conclusion reached by the Circuit Court, that the mining operations were carried on in disregard of the covenant in the lease that the land should be so supported that there would be no caving. Indeed, the evidence is strong that these mining operations were conducted in the most careless manner, and with a view to extracting the largest amount of ore with the least expense, in utter disregard of plaintiff's rights. In other words, if the defendant had been permitted to proceed with the work in the manner in which it was being done at the time the injunction issued, it would necessarily have resulted in great injury, if not in a total destruction of the property as a mining property.

Upon the whole record, the conclusion reached is that the decree of the Circuit Court must be affirmed.

HOOK, Circuit Judge (dissenting). One effect of the decision is that, whenever a court of equity may issue an injunction in aid of a cause of action that is purely legal, it may for that reason also draw to itself cognizance of the entire controversy. I think that this is an inadmissible enlargement of equitable jurisdiction. Kellar v. Craig, 126 Fed. 630, 61 C. C. A. 366. A lessor who claims that his lessees in possession have forfeited the lease by breach of condition subsequent has an adequate and efficient remedy at law by notice and action for wrongful detention. But if there is fear that, before the remedy can be made effectual, the leased property will be materially damaged by the lessees, he may apply to a court of equity to restrain the threatened damage pending his proceedings in the court of law; and thus may the rights of the lessor be fully secured, consistently with the preservation by the courts of their respective spheres of jurisdiction.

Again, this was a suit in equity to enforce a forfeiture. Kellar v. Craig, supra. It will not do to say that its purpose was to restrain trespass after a forfeiture had occurred through the acts of the lessees and the notice to quit. This would seem to be reasoning in a circle. The real issue in the case was whether in fact there was a forfeiture—whether the notice to quit amounted to anything. If the acts had not been committed, the lessees would have been entitled to remain in possession notwithstanding the notice. The case is not that of a trespass by a stranger to the title.

Nor can the suit be maintained as one to quiet title, the defendant being in actual possession. Boston, etc., Mining Co. v. Montana, etc., Co., 188 U. S. 632, 23 Sup. Ct. 434, 47 L. Ed. 626; Cosmos Exploration Co. v. Oil Co., 112 Fed. 4, 50 C. C. A. 79, 61 L. R. A. 230.

NOTE.—The following is the opinion of Philips, District Judge, in the court below, here published by request of counsel:

PHILIPS, District Judge. Prior to the granting of the temporary injunction herein the defendant was fully heard in opposition thereto, as if on a demurrer to the bill. Its counsel vigorously insisted on the final hearing that the complainant has no standing in a court of equity, for the reason that it has a complete and adequate remedy, if any, at law, by resort to the action of ejectment.

In modern equity jurisprudence in the federal courts it has become a crystalized rule that "it is not enough that there is a remedy at law. It must be plain and adequate, or, in other words, as practical and efficient to the ends of justice and its prompt administration as the remedy in equity." Boyce v. Grundy, 3 Pet. 216, 7 L. Ed. 655; Watson v. Sutherland, 5 Wall. 74, 18 L. Ed. 580; Preteca et al. v. Land Company, 50 Fed. 674, 1 C. C. A. 607; Empire, etc., Co. v. Bunker Hill, etc, Co., 121 Fed. 973, 58 C. C. A. 311. In the constantly developing complications growing out of new conditions and situations in our complex commercial and business affairs, the courts, in the very necessities of the occasions as they arise, must extend the protective, preservative hand of equity to meet the extraordinary demands of justice in the particular instance. The growth of mining industries of the country furnishes a striking illustration of the flexibility of equitable principles adaptable to the exigencies of the peculiar character and situation of such property. The owner of a tract of land chiefly valuable for its mineral deposits might have his property ruined if he were driven to the ordinary action at law for evicting the wrongdoer, burrowing beneath the comparatively worthless surface and extracting the ore. At the end of a tedious lawsuit he might find the under-surface despoiled of its riches, and his judgment for damages might be against an insolvent wrongdoer. In such instance a court of equity, on proper showing in the bill, would not hesitate to lay its restraining hand on the despoiler pendente lite, and at the end place the rightful owner in the peaceable and full possession of the property. It should make no difference that the wrongdoer has been admitted into the ground under a license contract to mine, if, after he enter, he so prosecute his explorations and excavations in disregard of the reversionary rights and interests of the owner of the fee as to threaten irreparable injury thereto, especially when such licensee is insolvent.

The contract of lease in question shows on its face that the lessor had in mind two considerations: First, to obtain as much royalty as was reasonably possible by having the mine speedily developed and diligently worked; and, in the second place, to safeguard his property against injury and ruin to the surface and the further successful prosecution of mining after the termination of the lease. To this end, the first paragraph of the contract provided that the lessees should commence the work of sinking shafts and mining the land in good faith within ten days, and should keep and have

on said lands sufficient pumps and machinery to drain the same of water, so as to permit efficient mining, and to properly operate the same and increase the capacity thereof from time to time as might become necessary. The second paragraph obligated the lessees, their successors and assigns, to mine the land "in a good, thorough and workmanlike manner, keep all shafts and drifts well and securely timbered and supported; and shall not remove such timbers and supports so as to endanger the ground or to permit the same to cave or fall in. Mining shall be carried on in good faith continuously, and shall not be suspended at any time except on written permission of the party of the first part." It is true that in case of default on the part of the lessees the contract provided for a re-entry by the lessor, on declaration of forfeiture and posting notice on the premises. But what relief did this furnish the complainant? He might stand on the surface of his freehold and proclaim, "I am lord and monarch of all I survey," but this would not stop the miners from burrowing beneath. With their machinery, picks, and giant powder, they stayed and continued to work. How was the complainant to stay the alleged increasing injury to his property? Should he resort to an action of eviction, and await the law's delay in such procedure against an insolvent, derelict lessee? Or shall he be permitted to appeal to a court of equity to stay the injurious work while the court hears and determines the controversy? In the latter case, if the complainant shall fail to make good his complaint, the defendant is protected by the injunction bond.

It does seem to me to be quite academic to discuss such questions as that a court of equity abhors forfeitures, and whether the interest of the lessees be that of a corporeal or incorporeal hereditament, or whether the landlord, by going onto the land and posting notice of forfeiture, is or is not so far in possession as to enable him to maintain a suit in equity to remove the recorded lease as a cloud on his title, and the like. The plain, practical fact obstinately remains that under color of the lease the defendant's sublessees continued to disregard the constructive re-entry; that they continued to mine, so that the work of injury to the interests of the landlord in his estate in remainder went on as theretofore.

It inheres in the powers of courts of equity, in the case of mines and collieries, to entertain bills in the nature of bills quia timet and bills of peace, and to remove, as a cloud on the title, recorded leases, where the mining property is exposed to irreparable injury, as where the lessee exceeds the limits imposed by the lease—especially where he is insolvent, and a continuation of his course and methods of mining in violation of the contract threatens great damage. Story's Equity Jurisprudence, pars. 860, 922; Pomeroy's Equity Jurisprudence, par. 1398, and notes; Bispham's Equity, par. 575; Iron Company v. Reymert, 45 N. Y. 703. In Alleghany Oil Co. v. Bradford Oil Company, 21 Hun, 26, 32, it is held that, where the condition absolutely avoids the license in case of breach, the estate lapses without any entry or notice. Citing Smith's Leading Cases, 109, notes to Dumpor's Case. So a court of equity in that case granted relief by injunction, annulled the lease, and restrained the defendants from boring for oil thereon. In Pendill v. Mining Company, 64 Mich. 172, 31 N. W. 100, upon failure of the lessee to pay rent, and while he had ceased to operate the mine, the lessor took possession under a provision of the lease for re-entry in case of nonperformance, and filed a bill to remove the cloud of the forfeited lease. The court decreed an injunction, notwithstanding the lessee had expended large sums of money in mining operations, and paid the landowner large royalties, and the lessee's machinery and tools were in the ground at the time of the forfeiture, just as is claimed in the case at bar. In Oolagah Coal Company v. McCaleb, 68 Fed. 87, 15 C. C. A. 270, the rights of the parties depended upon the legality of the license grant to each. The defendant being insolvent, Judge Thayer overruled the demurrer to the bill praying for an injunction to restrain the defendants from further mining coal and from obstructing the plaintiff in so doing, although the respective rights of the parties had not been determined in an action at law. So, in Preteca et al. v. Land Company, supra, and Dimick et al. v. Shaw, 94 Fed. 266, 36 C. C. A. 347, injunctions were sustained restraining mining operations, although the question of title between the parties had not been adjudicated at law. In Kentucky River

Nav. Co. v. Commonwealth, 75 Ky. 8, the court sustained a bill in equity in behalf of the state to determine and forfeit the navigation company's right under a lease from the state, on the ground of its failure to keep in repair the works and improvements along the river, where the company was insolvent. Mr. Justice Field, in Erhardt v. Boaro et al., 113 U. S. 539, 5 Sup. Ct. 566, 28 L. Ed. 1116, said: "It is now a common practice in cases, where irremediable mischief is being done or threatened, going to the destruction of the substance of the estate, such as the extracting of ores from a mine, or the cutting down of timber, or the removal of coal, to issue an injunction, though the title to the premises be in litigation. The authority of the court is exercised in such cases, through its preventive writ, to preserve the property from destruction pending legal proceedings for the determination of the title." And it may be added, under the recognized practice in equity, that, where the court becomes possessed of the cause in equity, it will maintain jurisdiction to the end; determining the legal rights of the parties to the property by putting the rightful owner in peaceable possession. In Mehaffey's Appeal, 4 Penny. (Pa.) 502, the authorities are fully discussed, holding that a forfeited lease may be regarded as a paper, although functus officio, and is subject to cancellation by a court of equity. This should be so, for the reason that the lease in question runs for ten years from the 1st day of May, 1898. It was duly acknowledged and recorded in the recorder's office of Jasper county, Missouri, where the land is located; and as long as it remains uncanceled of record it constitutes a cloud on complainant's title. "In a case like this, equity follows the law, and will enforce the covenant of forfeiture, as essential to do justice. It is true, as a general statement, that equity abhors a forfeiture, but this is when it works loss that is contrary to equity, not when it works equity and protects the landlord against the indifference and laches of a lessee and prevents great mischief." Brown v. Vandergrift, 80 Pa. 142; Munroe v. Armstrong, 96 Pa. 307. So, Mr. Justice Miller, on the circuit in this court, in the case of Kansas City Elev. Co. v. Railroad Company, 17 Fed. 200, said "that the right of re-entry and forfeiture, in regard to the terms of the lease, is a right which the courts at common law dealt with very rigidly and strictly, while a court of equity very often sets aside and restores the parties to their former position, and refuses compensation for any damage done. There is, however, a different mode of proceeding to declare the lease forfeited. When either party—lessor or lessee—claims that acts have been done which render the continuing of the relation no longer proper, such party can go into a court of equity, on general principles, and ask to have that lease set aside, canceled, and annulled. In that case the court of equity sits, holding the scales of justice evenly between the parties, and may say that it believes that such acts have been done by the lessee, for instance, as ought to terminate the agreement, or that he shall account by compensation and by payment of damages. And the court will declare the agreement at an end, and set aside and annulled, and will make such orders as seem proper and right."

The complainant has filed exceptions to certain portions of the defendant's amended answer herein, and the defendant has asked leave to file a cross-bill tendered to the court. It being the desire of both parties, expressed at the hearing, to have a speedy disposition of the whole case on its merits, and all the evidence having been taken which either party desires to take, it was assented to that the court should consider all these questions, and the case be submitted for final determination.

Foremost among the matters of special defense excepted to is that of waiver or estoppel, predicated of the allegation that after the complainant was advised of the alleged grounds of forfeiture, and after formal declaration of forfeiture, he accepted rentals from the defendant. It may be conceded to the defendant that, as a general rule, the acceptance of the payment of rent constituted a waiver of antecedent forfeiture; but the rule is as firmly established that where the obligation of the defendant to do or to forbear doing certain acts is a continuing obligation, which the tenant persists in disregarding, it is a continuing cause of forfeiture, which "the landlord will not be precluded from taking advantage of by receiving rent which accrued after the breach was originally committed." Much less does it constitute a

waiver where the landlord simply stands by, with knowledge of the breaches of the lease, where they are continuing from day to day. Bleecker v. Smith, 13 Wend. 531; Taylor on Landlord & Tenant, § 500; Conger v. Duryee, 24 Hun, 617; Douglas v. Herms, 53 Minn. 209, 54 N. W. 1112; Gluck v. Elkan, 36 Minn. 80, 30 N. W. 446; Ainley v. Balden, 14 U. C. Q. B. 535; Farwell v. Easton, 63 Mo. 446; Mulligan v. Hollingsworth et al. (C. C.) 99 Fed. 220, 221. In Alexander v. Hodges, 41 Mich. 691, 694, 3 N. W. 187, 188, Campbell, C. J., said: "The desire of the landlord to avoid coming to extremities if the lessee would mend his ways cannot be regarded as a waiver, but was laudable and calculated to further the interests of both. Where there is such a continuous obligation, there is nothing to prevent the exercise of forbearance until it ceases to be desirable." The requirements imposed by the lease at bar were continuing obligations, and were violated up to the hour of the application for a temporary injunction herein, if the complainant's testimony is to prevail.

Other matters of special defense set up in the amended answer were substantially pleaded in the original answer, exceptions to which were sustained by the court. Their repetition in the amended answer adds no virtue to the error, nor force to the matter. They are statements to the effect that the defendant's subtenants, in their manner of working the mine, pursued the course approved by other mine operators in that locality, and that they worked the mine as they deemed most advantageous for the lessor, and as best they could under the circumstances of the local situation, and the like. Such special matters constitute no defense. The requirements of the contract, as its terms have received settled construction by courts of recognized authority, must control.

For instance, the gravamen of the complaint is that the defendant's sublessees were mining in such manner as to permanently injure the surface superstructure of the premises, and do irreparable injury to the mineral deposits. The law is appositely expressed by the court in Robertson v. Coal Company, 172 Pa. 566, 33 Atl. 706. There the defendant sought to prove that it was regarded as good mining to take out the coal in the manner pursued; that it was skillfully done, in respect of the depth of the surface and the condition of the rock over the coal; that the surface over this particular deposit was light, and the rock was rotten or broken, so that it would be impossible to take the coal without doing some injury to the surface; that the coal was mined according to approved methods of mining practiced throughout that region, as approved by experienced mining engineers; and that the coal under such light surface could not be mined by any known method without doing some injury to the surface. This evidence was excluded. The court said: "The owner of the coal, though he has a right to take it out, must support the surface above. * * * This is a duty devolving upon the owner of the coal, who takes it out by virtue of the relations between the two parties. Therefore, if the coal is taken out, and the surface is injured in any way by reason of taking the coal out, the defendants are bound to make the injury good. * * * It does not make any difference whether the mining is done in the ordinary and usual way of mining coal, or whether there is negligence in the mining of the coal. It is an absolute right that the plaintiffs have to have their surface supported, and if that support is interfered with, intentionally, negligently, or otherwise, the plaintiffs are entitled to recover." So, Shearman & Redfield on Negligence (5th Ed. § 716) state the general rule to be that "where, as is often the case, the title to the surface of the land is in one person, and the title to the minerals underneath the surface is in another, together with the right to excavate for and remove them, * * * unless there is some particular law or contract affecting the rights of the parties the miner is in such case absolutely bound to leave sufficient support to the surface to prevent it, while in a natural state, from falling in." Indeed, in the absence of a special contract limiting the right, it is the well-settled rule in such mining contracts that "the owner of the surface is entitled to absolute support, not as an easement of right depending on a supposed grant, but as a proprietary right at common law. * * * The right of a surface owner has been likened to that of an owner of an upper story of a house, who holds his tenement with an implied right to support from

the owner of the lower story. * * * If .the owner of the land grant a lease of minerals beneath the surface. with power to work and get them, in the most general terms, still the lessee must leave a reasonable support to the surface; and so, conversely, when the minerals are demised and the surface is retained by the lessor, there arises a prima facie·inference at common law, upon such demise, that the lessor is demising them in such a manner as is consistent with the retention by himself of his own right of support." Snyder on Mines, § 1020. "The word 'surface' as used in the books, means not ·simply the geometrical superficies, without thickness, but includes whatever earth, soil, or land lies above and superincumbent on the mine." Section 1030. The rule is thus stated in Wood on Nuisances, § 192: "The person owning the minerals is bound at his peril not to cause a subsidence of the surface, even though he cannot work his mines at all without doing so, and no degree of care or skill exercised in the mining operations will shield him from liability to the owner of the surface for all damages sustained by reason of any subsidence thereof. A custom, as between the owner of the surface and the owner of the mines, entitling the owner of the mines to cause a subsidence of the surface if necessary to the working of the mines, will not be operative to shield the mine owner from liability, and such a custom has been held bad and wholly void." This rule is recognized and enforced in Brown v. Torrence, 88 Pa. 186. In Humphries v. Brogden, 12 Ad. & El. (N. S.) 739, it was held that notwithstanding the jury found that the defendant had worked faithfully according to the custom of the country, but without leaving sufficient pillars of support, the plaintiff was entitled to judgment. After discussing the question the court asserted the rule to be that, in the absence of any express reservation, the owner of the surface is entitled to protection, without any reference to the nature of the strata of mineral deposits or the difficulty of propping the surface, or the comparative value of the surface and the mineral. In Randolph v. Halden, 44 Iowa, 327, the defendant sought to show a custom among miners, when the coal is exhausted, to remove the supporting pillars. · The court ruled that such custom was wholly inadmissible, for the reason that "it is made manifest if the pillars are removed the mine will not and cannot be left in good working condition at the expiration of the lease, and it is also manifest that the removal of coal will cause depressions on' the surface of the ground." The Supreme Court of Ohio, where there is much coal mining pursued, recognizes this doctrine to its fullest extent. In Burgner v. Humphrey, 41 Ohio St. 340, after reviewing the authorities, the court said: "This obligation to protect the superincumbent soil exists, whether there is a conveyance of the surface, reserving the minerals, or a grant of the minerals without a conveyance of the surface. In either case the presumption arises that the owner of the minerals is not, by removing them wholly or in part, to injure the owner of the soil above. * * * The right .which the surface has to support is a part of the freehold, and not an easement. It is a right independent of the nature of the strata, and the mine owner can only work so far as is consistent with this right, and is liable if he violates it. The highest care and skill in the working of the mine is no defense whatever, if injury results to the surface from a removal of the subjacent strata." See, also, Randolph v. Halden, 44 Iowa, · 327; Consol. Coal Co. v. Schaefer, 135 Ill. 210, 25 N. E. 788; Yandes v. Wright, 66 Ind. 319, 32 Am. Rep. 109; Erickson v. Iron Co., 50 Mich. 604, 16 N. W. 161; Marvin v. Iron Co., 55 N. Y. 538, 14 Am. Rep. 322; Jones v. Wagner, 66 Pa. 429, 5 Am. Rep. 385; Carlin v. Chappel, 101 Pa. 348, 47 Am. Rep. 722; Zinc Co. v. Franklinite Co., 13 N. J. Eq. 322, 341.

The first thing done by defendant on notice of this suit, and on a Sunday morning, was to gather up a number of mining overseers and operators at Joplin, who were hurriedly conducted through the drifts of the mines in question, with the view of passing judgment upon the reasonableness of the methods pursued in running the drifts. It is difficult for the impartial mind to escape the impression that, from the time occupied, and manner of making this inspection, it was most superficial, largely speculative, and quite .self-serving. Their conclusions were based much upon the methods which they had pursued in working out such properties. But as is frequently the case where there is a large mass ·of testimony, characterized by technical

quibbles and refinements, and contradictions among partisan witnesses, there are found in this evidence some unquestionable physical facts, which no reckless assertion can contradict, and no impartial mind can evade.

The court has already quoted the obligations of the lessee imposed in the second paragraph of the contract.

As shown by the plat in evidence of this mining company, there is a seam, an opening in the ground, extending along the west line of the property to the north, and then in a circle south, as if it had been done by a crack or an earthquake, described by the engineer, McKee, as a "fissure or crack in the ground on the surface, and as well defined. In some places it is a foot wide, in some places just a mark. And that line marked 'Crack' describes the outer edge of the piece of ground that is falling in. There has been some caving, of course, to break the ground and draw it that way." Another witness testified that that crack "would indicate that there was a cavern in the surface, and this portion of the ground has settled away from the other. * * * When I was there last Saturday and noticed it, it had widened out to about ten inches where it had not been disturbed. * * * The ground under which I refer to as having sunk was inside of that circle." The method of mining pursued was such as to show several large depressions and cavings in of the surface of the ground about where the drifts were run, on lots 25, 32, 39, 40, and 46. The large cave in the southwest corner of lot 46 of this property began in January, 1903. The next largest cave, between lots 39 and 46, occurred in July, 1903. The large cave designated on the map as "Fall," lot 40 (what is known as the "Red Bud Mill"), came through to the surface in July, 1903, which the subtenants undertook to fill up with tailings in order to prevent damage to the Red Bud mill. The large cave in southeast corner of lot 32 and the northeast corner of lot 39, extending over into lot 31, occurred on September 28, 1903. And a smaller cave in the southeast corner of lot 25 occurred in October, 1903. The cave on the line between lots 39 and 46 is in the tailing pile of the Red Bud Company, over a drift which the miners call the "Cañon." This cañon is described by the witness as a "large place cut out there, and no timbers in it." It was about 100 feet long and between 50 and 60 feet high, 10 feet wide at the bottom, and 35 or 40 feet at the top. It was not properly timbered. The witness testified that he was requested by the superintendent of the Red Bud Company to try to timber this cañon, but, to use his language, he "passed the job up, and would not undertake it at all." This cave over the cañon was described by the engineer, McKee, as "a hole about 60 feet across or in diameter, and nearly 70 feet across one way; nearly round. The hole appears to be even with the top of the ground." The cave in the southeast corner of lot 25 is 27 feet in width. The defendant's principal witness, Williams, in attempting to explain the cause of this cave, said: "About 40 or 60 feet north of the shaft, where we come in contact with some of the best ore in the roof, we made it fall by taking out the timbers." What is known in the testimony as the "Gulch," in the southwest corner of lot 40, extending southward, is an excavation of undue proportion. It is described by a witness as "a drift running from the mill shaft to shaft No. 2, 75 feet wide, at least, east and west, 40 feet high in the center, sloping off in all directions. It was not timbered. It came up in a dump shape in the center. It caved before I left—not to the top, but it had the drift filled up there 30 or 40 feet."

The expert witnesses and practical miners are generally agreed upon the proposition that in running drifts the proper method of timbering is by posts set in the mine, with cross-timbers laid or built up after the fashion of a rail pen, and that, in order to strengthen them, they should be penned by a sufficiently strong piece of timber to bind them together to keep them from spreading, and to sufficiently support the roof wall, and to prevent sagging and giving in of the surface, and that this should be keyed up closely to the wall, and these supports should be left in place. The evidence shows quite satisfactorily that in many of the shafts the timbering up of the mine was not properly or sufficiently done, and that in some cases the pillars were taken out as the work progressed, and the consequence would be a subsidence of the surface at such points. In some of the drifts—as in the Jupiter mine, for instance—there would be a place forty feet wide which was merely snow-

shedded to protect the miners from falling stones, and the like, but which did not perform the office of supporting and staying the roof. None of the timbers in that drift were pinned to the roof. In one place on the Jupiter side of the Fairview ground there was a place 75 feet in width containing good dirt, where they cut a hole from the upper ground to the lower, and rolled the dirt through a chute to the lower ground, causing the ground to settle very fast. So in the drifts from the Red Bud mine, going south, for a distance of more than 300 feet the drifts had caved in some places to the surface, due either to the improper method of mining and timbering, especially noticeable in what is called the "Cañon" and the "Gulch" drifts.

Much of the controversy in evidence among the witnesses was respecting the extraordinarily large cave-in in the southwest corner of lot 46, on the dividing line between that and what is known as the Royal Company, south. The evidence shows that where two mining claims, owned by different miners, come together, the custom among miners is that the miner who first reaches the boundary line seems to have the privilege of "shaving the line," and that the adjoining miner, in order to keep the surface of the ground supported, is to leave a pillar. Waiving any discussion of the legality of such custom, the evidence shows that the Royal Company, on the south, reached this dividing line first. When the Red Bud Company reached that locality with its drift, there was evidently much rivalry between the two companies as to which would first reach the large mineral deposits manifest in that locality. The Royal Company was in the advance. When the Red Bud Company came, it was driving a drift some 15 feet lower than the floor of the Royal drift, both carrying the roof at the same level. As the Red Bud Company went westward, its ore body seemed to incline upwards at an angle, fixed by the witnesses at about 25 degrees, so that when it reached a point near the center of the lot it was cutting a drift from thirty-five to forty feet high. It seems to have timbered fairly well the first part of the line drift, but contented itself in the latter portion of its work with snow-shedding, and in some places it had no timbers at all. The timbers used by it were 18 to 20 foot posts, of insufficient size, on which were placed caps and stringer poles 20 feet in height. On this, pens were built to support the roof, but without sufficiently tying them in the middle. It was not possible to wedge a 20-foot pen sufficiently to the roof of a drift to hold the weight. The result was that just after the Red Bud Company made its excavation to the southwest corner of lot 46 the surface of the ground at that point sunk and caved in, so that for a distance of over 120 feet, east and west, the line drift was filled; and the engineer, McKee, testified that "the break in the surface over the line drift is about 58 feet north and south at the widest point, and east and west about 120 feet along the line." The witnesses on the part of the Red Bud Company sought to throw the responsibility for this caving in on the Royal people, and the latter sought to place the responsibility on the Red Bud Company. It satisfactorily enough appears, however, that the Royal Company employés, entertaining the idea that they had a right to "shave the line," having reached it first, on discovering that the Red Bud employés did not intend to leave a pillar of support, protested against this act of omission; and it was proposed by the foreman of the Royal Company that each party should leave 6 feet of the pillar on each side of the line, making a support of 12 feet wide along the line. Had this been accepted and acted on, there would have been no cave-in, or, if the Red Bud Company had left the pillar on its lot along the line, it would have been sufficient. The defendant's principal witness on this branch of the case himself testified that "I proposed to him to leave one half the pillar if he would leave the other half," which he claims he was refused. There was also on this issue some evidence tending to show that the Red Bud ground boss had put a heavy shot under some timbers of the Royal Company on the south side of the Red Bud drift, and exploded small charges of powder in it to make it larger, and that after this shot the entire timbering of the Royal and Red Bud line drifts was knocked down and filled the Red Bud drift, and that some time after this the surface of the overhanging ground caved.

While it is to be conceded that there is much conflict between the witnesses respecting the greater responsibility for this immense caving in, it is perfect-

ly manifest that the foreman of the Red Bud Company, by his own admission, shows that he recognized the necessity of a pillar being left there to support the supersurface. Whether or not the failure, as between him and the foreman of the Royal Company, was that of the one or the other, can in no degree, in contemplation of law, absolve the defendant company from the obligation imposed upon it by the contract to see that the place was properly timbered and properly mined, so as to prevent caving in where it was in fact running its drift in order to reach the mineral deposit ahead of the other company. No matter what the situation of the ore deposit there was, or what the difficulties were under which it was placed to reach it in advance of the Royal Company, it had to observe the express provision of its contract, and the law of the land written into it, that it must so mine as not to permanently injure the supersurface estate. And if, as a matter of fact, the Royal Company, in shaving the line, failed to perform its duty in timbering up and leaving a sufficient pillar or support, and the like, this fact being known to the lessee, it was its duty to have enjoined the adjacent mine owner and operator, and to have protected itself against any derelictions on the part of its rival. On reading the testimony bearing on this controverted question, I am satisfied that in large measure the responsibility for the great subsidence and cave-in at this place was the failure of the defendant's sublessees, induced by their haste in the race with the Royal Company to reach the point of vantage ground first.

The defendant, in some of its testimony, undertook to extenuate the fact of the timbers of the Red Bud mine failing to hold firm the surface of the ground by showing that it resulted from some of the timbers employed by them having the "dry rot." Even if the dry rot did get into some of the timbers and cause them to fall, such fact would not relieve the defendant from its obligation to so excavate the mineral as not to injure the surface. As suggested by complainant's counsel in his brief, it is a little remarkable that if, as a matter of fact, the timbers were affected by the dry rot, there was not a physical presentation of this evidence. The examination made by the witness Denny shows that on an investigation of the drifts in the Red Bud mine he found no evidences of dry rot; but, on the contrary, the specimen taken from one of the down timbers, and presented as an exhibit in this case, shows that it was perfectly sound.

The effect of the subsidence and caving in of the surface of these mines, the imperfect manner of driving the drifts and the hunting about for pay ore, are so apparent to the common sense as hardly to require the assistance of expert testimony. The substance of this is that if the drift that runs through a body of ore is imperfectly timbered, where there is mineral between the top of the drift and the surface of the ground, the roof of the drift, as the witnesses term it, "chimneys up" toward the ground, so that the waste and pay ore settle in a mass on top of the timbers. And the mine operator afterwards finds it unprofitable to mill this dirt, so that the mineral is left in the ground, either on top of the timbers, or, if they break, the drift must be abandoned. Necessarily the owner of the land must lose his royalty on a large part of the ore, which he would receive in a careful system of mining. As one of the experts said, touching the impracticability of getting all of the ore left above in the Jupiter and Red Bud mine: "When you come to pulling your ground, you come in contact with your waste. That makes your dirt so thin that the mine operator will cease working it. In the next place, when you come to pulling your ground, your waste will come in and shut your ore and dirt off, and continue to run, and leaves your ore and dirt back there. If the waste will run before you ore, the dirt will run too." That, if there is any ore between the place where the ground is thrown and the surface, "it will have to be got out with individual or personal work. It is not ore that would pay a company to employ a force of men. It would be the work generally of individual men doing their own work." The defendant's principal witness, Wilson, conceded that, if the ground is thrown down so that the surface comes in, the ore in the upper levels "is in the crushed mass that lies there, and there is no way to get it, unless you can get in an upper level and run through and hold it with timbers and get it. After it is broken once, it is harder to hold; and after the ground is thus

thrown it is rarely bothered with." That this condition resulted from the improper method of timbering the drifts, or not timbering at all where it was required, I am satisfied the weight of evidence tends strongly to show.

It only remains to observe that, in respect of the cross-bill tendered by defendant, it is based upon what the defendant conceived would be the large amount of its loss resulting from the temporary injunction granted by the court, whereby the operations of its subtenants were stopped, and the defendant deprived of its royalty received pendente lite. When this cross-bill was presented by the defendant, with a request for leave to file the same, it was suggested by its counsel that the amount of the injunction bond would not be sufficient to indemnify the defendant in case the injunction should be dissolved. To meet this suggestion, the court increased the amount of the injunction bond three thousand dollars. Superadded to this is the conceded fact that the complainant is entirely solvent and amply able to respond to any possible damage the defendant might sustain, and the further fact that the entire amount of royalty received by complainant was placed by him in a bank at Joplin, and kept intact, to be applied to any judgment to which the defendant might be entitled. The cross-bill also contains the vice, found in the answer herein, of pleading matters in extenuation of its derelictions and of estoppel—the waiver hereinbefore discussed. The cross-bill, as does the answer, also makes statements about the machinery the sublessees have bought and placed in the mine for operation, and the outlays they have made with a view to the continued successful development of the mine. Such matters constitute no defense or ground of relief. If the defendant or its lessees have any machinery in these mines, they can take them out. The provisional restraining order granted by the court reserved to the subtenants the right of access to their machinery to care for and protect the same; and, by convention between the parties, for the better protection of the mine, in the interest of all the parties concerned, the complainant, through others, operated the same, depositing the amount of royalty, as hereinbefore stated, in the bank at Joplin, subject to the rights of the parties as they might appear in the end. The evidence clearly enough establishes the insolvency of the defendant corporation. It was organized solely by the lessees of the complainant for the purpose of subletting the mining rights it obtained under the lease. Practically it had no other property of any consequence. It results that the issues are found for the complainant, and the injunction is made perpetual, with a decree annulling the lease and setting aside the same as a cloud upon complainant's title.